IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
November 2004 Session

# KENNATH HENDERSON v.  STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Fayette County**
**No.  4465   Jon Kerry Blackwood, Judge**

---

**No. W2003-01545-CCA-R3-PD  - Filed June 28, 2005**

---

The petitioner, Kennath Henderson, appeals as of right from the May 21, 2003 judgment of the Fayette County Circuit Court denying his petition for post-conviction relief.  The petitioner entered guilty pleas to first degree premeditated murder, two (2) counts of especially aggravated kidnapping, aggravated robbery, attempted especially aggravated kidnapping, aggravated assault, and felonious escape.  The petitioner waived his right to jury sentencing.  After a capital sentencing hearing, the trial court imposed the death sentence for the murder count and an effective sentence of twenty-three (23) years in prison for the noncapital offenses.  The petitioner's convictions and sentences, including the sentence of death, were affirmed on direct appeal by the Tennessee Supreme Court.  See State v. Henderson, 24 S.W.3d 307 (Tenn. 2000), cert. denied, 531 U.S. 934 (2000).  A pro se petition for post-conviction relief was filed on February 12, 2001, which was followed by an amended petition on November 30, 2001.  An evidentiary hearing was held on April 28-29, 2003, and, on May 21, 2003, the trial court denied relief and dismissed the petition.  The petitioner appeals, presenting for our review the following claims: (1) the trial judge erred in failing to recuse himself at both the trial and the post-conviction hearings; (2) the post-conviction court's findings were clearly erroneous; (3) trial counsel was ineffective; (4) appellate counsel was ineffective; (5) the post-conviction court erred in prohibiting a witness from testifying; and (6) the imposition of the death penalty is  unconstitutional.  After a careful and laborious review of the record, this Court concludes that there is no error requiring reversal.  Accordingly, the order of the post-conviction court denying post-conviction relief is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JERRY L. SMITH, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, and, J.C. MCLIN, JJ., joined.

Donald E. Dawson, Nashville, Tennessee, and Catherine Y. Brockenborough, Nashville, Tennessee, for the appellant, Kennath Henderson.

Paul G. Summers, Attorney General and Reporter; Alice B. Lustre, Assistant Attorney General; Elizabeth T. Rice, District Attorney General and Walt Freeland, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### *Background*

The proof, as set forth in our supreme court's decision, State v. Henderson, 24 S.W.3d at 210, established the following:

> At the time of the events giving rise to this case, the appellant, Kennath Henderson, was incarcerated at the Fayette County Jail serving consecutive sentences for felony escape and aggravated burglary. On April 26, 1997, as the appellant was planning an escape from jail, he had a .380 semi-automatic pistol smuggled into the jail through his girlfriend. A couple of days later, the appellant requested dental work on a tooth that needed to be pulled, and an appointment was made for May 2 with Dr. John Cima, a dentist practicing in Somerville. Dr. Cima had practiced dentistry in Somerville for more than thirty years, and he had often seen inmate patients. In fact, this was not the appellant's first visit to see Dr. Cima.

> On May 2, 1997, Deputy Tommy Bishop, who was serving in his official capacity as a transport officer for the Fayette County Sheriff's office, took the appellant and another inmate, Ms. Deloice Guy, to Dr. Cima's Office in a marked police car. Upon their arrival at the dentist's office, Dr. Cima placed the appellant and Ms. Guy in separate treatment rooms, and each patient was numbed for tooth extraction. Deputy Bishop remained in the reception area and talked with the receptionist during this time.

> When Dr. Cima and his assistant returned to the appellant's treating room to begin the tooth extraction, the appellant pulled out his .380 pistol. Dr. Cima immediately reached for the pistol, and he and the appellant struggled over the weapon. During this brief struggle, Dr. Cima called out for Deputy Bishop, and the deputy hurried back to the treatment room. Just as the deputy arrived at the door, the

2

appellant regained control of the pistol and fired a shot at Deputy Bishop, which grazed him on the neck. Although not fatal, this shot caused the deputy to fall backwards, hit his head against the doorframe or the wall, and then fall to the floor face down, presumably unconscious.

The appellant then left the treating room and came back with the receptionist in his custody. The appellant reached down and took Deputy Bishop's pistol, and he took money, credit cards, and truck keys from Dr. Cima. The appellant then ordered Dr. Cima and the receptionist to accompany him out of the building, but just before he turned to leave the building, the appellant went back to the treatment room, leaned over Deputy Bishop, and shot him through the back of the head at point-blank range. The deputy had not moved since first being shot in the neck moments earlier and was still lying face-down on the floor by the door to the treatment room when the appellant fatally shot him.

Once outside of the office, the appellant was startled by another patient, and Dr. Cima and his receptionist were able to escape back into the office. Once inside, Dr. Cima locked the door and called the police. The appellant, in the meantime, stole Dr. Cima's truck and drove away at a slow speed so as not to attract any attention to himself. When police officers began to follow him, the appellant sped away, and eventually drove off the road and into a ditch. The officers took the appellant into custody, and upon searching the truck, they found the murder weapon, Deputy Bishop's gun, and personal items taken from Dr. Cima's office.

On May 13, 1997, the appellant was indicted by a Fayette County Grand Jury in a ten-count indictment, which alleged one count of premeditated murder, three counts of felony murder, two counts of especially aggravated kidnaping, and one count of attempted especially aggravated kidnaping, aggravated robbery, aggravated assault, and felonious escape. After three continuances, the appellant pled guilty on the day of trial to all of the charges except for the three counts of felony murder.

On July 13, 1998, the circuit court held the sentencing hearing, and the appellant waived his right to have a jury empaneled for purposes of determining his sentence. Several witnesses testified for the State at the sentencing hearing, including Deloice Guy, the inmate taken with the appellant to the dentist by Deputy Bishop; Dr. John Cima; Donna Feathers, Dr. Cima's dental assistant; and Peggy Riles, Dr. Cima's receptionist. In addition, Dr. O.C. Smith, a forensic pathologist, testified as to his investigation of the crime scene and of his autopsy of Deputy Bishop. Dr. Smith stated that based on his examination of Deputy Bishop's wounds, along with witness testimony, it was likely that the first shot fired by the appellant hit the deputy in the neck, and caused the deputy to hit his head against the doorframe of the examination room. Dr. Smith opined that this blow to the deputy's head could

3

have rendered him unconscious. Moreover, Dr. Smith testified that the second shot fired by the appellant entered at the back of the deputy's head and exited near the left eye. This second shot caused "significant and severe brain damage," and the blood from this wound seeped from the skull fractures into the deputy's sinuses, and ultimately, was breathed into his windpipe. Finally, Dr. Smith testified that the bullets used by the appellant could have "easily" penetrated the thin walls of the dentist's office.

In mitigation, the appellant testified on his own behalf. According to his testimony, he was 24 years old at the time of the offense. He was a high-school graduate and has four younger brothers. While in elementary school, the appellant received numerous academic awards and certificates, and he was heavily involved in extracurricular activities and sports while in high school. Although the appellant expressed sorrow and remorse over his actions, he admitted that "[t]here's no reason" for the murder of Tommy Bishop. While he acknowledged that he extensively planned his escape from prison, including procuring the .380 pistol, his only excuse for the shooting was that he "wasn't thinking clearly that day."

The appellant also testified that he had some "problems" in high school, and although he was never cited to the juvenile court, he stated that he felt like his problems were never addressed. He also testified that while in jail in 1996, he requested counseling because he "felt like [he] needed help psychologically." His mother testified, however, that she did not believe that the appellant needed any help or intervention of any kind during his high school years. In addition, the appellant's mother testified that though she remembered that the appellant requested help while in jail in 1996, she never pursued the matter because he "seemed to be doing fine when [she] talked to him."

Finally, Dr. Lynne Zager, a forensic psychologist, testified as to her findings and conclusions based on two interviews with the appellant, a personality test administered to the appellant, and other information supplied by the defense. From this pool of information, Dr. Zager concluded that the appellant was suffering from dissociative disorder at the time of the murder, and that the appellant possessed an unspecified personality disorder which exhibited some narcissistic and anti-social traits. She also testified that based upon her testing, she believed that the appellant's dissociative state began after the first shot was fired and lasted at least 24 hours following. While in this state, Dr. Zager stated that it was not uncommon for individuals to feel as though they are in a dream-like state and are not "an integral part of what the person is [really] doing." Although she refused to give an opinion as to whether the appellant was aware of his actions at the time of the murder, the appellant, in her opinion, "was [acting] under duress, and that his judgment was not adequate." In addition, while Dr. Zager considered him to be "impaired at the time,"

4

she testified that the appellant's condition at the time of the murder would not support a legal finding of insanity.

The State argued that four aggravating factors applied to warrant imposing the death sentence: (1) that the defendant created a great risk of death to two or more persons during the act of murder, Tenn. Code Ann. § 39-13-204(i)(3); (2) that the murder was committed for the purpose of avoiding an arrest, Tenn. Code Ann. § 39-13-204(i)(6); (3) that the murder was committed during the defendant's escape from lawful custody, Tenn. Code Ann. § 39-13- 204(i)(7); and (4) that the murder was committed against a law enforcement officer, who was engaged in the performance of official duties, Tenn. Code Ann. § 39-13-204(I)(9).

The appellant argued that four statutory mitigating factors should be considered by the court: (1) the lack of significant criminal history by the defendant; Tenn. Code Ann. § 39-13-204(j)(1); that the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance, Tenn. Code Ann. § 39-13-204(j)(2); (3) that the defendant acted under extreme duress; Tenn. Code Ann. § 39-13-204(j)(6); and (4) that the murder was committed while the defendant's mental capacity, while not deficient to the point of raising a defense, was substantially impaired, Tenn. Code Ann. § 39-13-204(j)(8). In addition, the defense argued for application of an additional non-statutory mitigating circumstance, i.e., that the failure to recognize and treat the mental health disorders of the defendant allowed such to remain untreated by any form of intervention.

At the conclusion of the hearing, the circuit court found that all four of the aggravating circumstances were proven beyond a reasonable doubt by the State. Although the circuit court did not make a specific finding as to which mitigating circumstances were supported by the evidence, the court found that the aggravating circumstances had been proven beyond a reasonable doubt to "outweigh the mitigating circumstances." The circuit court then imposed the sentence of death for the premeditated murder of Deputy Tommy Bishop.

All of the prison terms, except the term imposed for felonious escape, were ordered to run concurrently with each other, but to run consecutively with the sentences then being currently served by the appellant. The prison term for felonious escape was ordered to run consecutively to all of the non-capital offenses. Accordingly, the effective sentence ordered by the court in this case is death and a prison term totaling 23 years, which is to run consecutively to the current prison sentence.

Henderson, 24 S.W.3d at 310-12 (internal footnotes omitted).

5

*Evidence Presented at Post-Conviction Hearing*

Michael Robbins was appointed by the trial court to represent Petitioner Henderson on direct appeal. He stated that for the past twelve (12) or thirteen (13) years "forty percent or more" of his practice has been state and federal appeals. He added that he annually attended the national habeas seminar "put on" by the federal defenders.

Mr. Robbins testified that only one issue was raised on direct appeal, i.e., the proportionality of the imposition of the death penalty in this case. The focus of his appellate argument relied upon the premise that the death penalty was reserved for the "worst of the worst," distinguishing the case herein from other such cases. He added that he spoke to both Mr. Mosier and Mr. Johnston, the petitioner's trial counsel, during the early stages of the appeal. Regarding his failure to raise appellate challenges to the denial of various pretrial motions, Mr. Robbins explained that "[t]here was no significant motion practice in that sense. Most of the motions were generalized objections to the death sentence or selection of the jury panel . . . and there was argument on the motion. . . ." No error as to the rulings on these motions was argued on direct appeal because Mr. Robbins "did not consider the motion[s] to be well grounded." He explained that the law in Tennessee and in the United States was well-settled as to these issues.

On cross-examination, Mr. Robbins stated that he only raised the proportionality issue on direct appeal because "[i]t was [his] professional judgment that that was the only viable issue." He further acknowledged that he did "file a motion seeking a remand for the purpose of conducting an evidentiary hearing in the Court of Criminal Appeals" based upon what he perceived to be a "motion to withdraw [Henderson's] plea of guilty." Mr. Robbins asserted that his appellate experience was "[v]irtually entirely criminal." He testified that, during the course of his representation, he did consult with David Keefe and Jefferson Dorsey, whom he believed to be associated with the predecessor office to the Office of the Post-Conviction Defender. On re-direct, Mr. Robbins admitted that these individuals recommended raising issues relating to the constitutionality of the death penalty statutes. Mr. Robbins later opined that this case "was peculiar because never . . . [had he] ever even heard of an attorney waiving a jury for sentencing in a capital case." He added that a decision to waive a jury and submit a capital sentencing case to a single person was "woefully uninformed."

Kathryn Pryce, an investigator and legal clerk with the Office of the Post-Conviction Defender, was assigned to work on Petitioner Henderson's case. Her duties as an investigator include locating and requesting a client's records. In the present case, Ms. Pryce requested the Petitioner's (1) institutional records, including school, medical, psychiatric, court records, attorneys' files, prosecution files, and law enforcement files, (2) medical and psychiatric records of family members, and (3) school records of family members. In this regard, Ms. Pryce acknowledged that

she received records for Herbert Henderson, the petitioner's uncle; Cora Lee Johnson, the petitioner's aunt; Glenn Johnson, the petitioner's second cousin; and Veaster Hill, the petitioner's paternal grandmother. These records reference other family members that had been treated at Western Mental Health Institute, J.B. Summers Counseling Center, and Methodist Hospital. Ms. Pryce also possessed law enforcement records relating to Shelby County rapes involving the petitioner and relating to prior offenses occurring in Fayette County, specifically contributing to the delinquency of a minor. Ms. Pryce stated that she began collecting the various records in April 2001.

Andrew Johnston, second chair counsel at the petitioner's trial, testified that he was appointed to represent the petitioner in June 1997. Lead counsel, Michael Mosier, had already been appointed at this time. Mr. Johnston stated that he was to serve as "local counsel." In other words, he was to file documents prepared by Mr. Mosier and he would meet with the petitioner's family if necessary. In this regard, Mr. Johnston testified that he met with the petitioner's family about three (3) or four (4) times. He added that he met with the petitioner on numerous occasions prior to trial.

At the time of his appointment, Mr. Johnston had been licensed as an attorney for two (2) years and eight (8) months. Mr. Johnston stated that this was his first capital case. Prior to this appointment, the most serious case handled by Mr. Johnston was either an aggravated robbery or aggravated burglary. His practice was forty percent (40%) criminal, mostly handled in General Sessions Court. Post-conviction counsel informed Mr. Johnston that the standards for capital representation went into effect July 1, 1997, after Mr. Johnston's appointment in this matter. These standards express requirements for capital counsel in regards to the number of trials in which they have to participate, among other things. Mr. Johnston conceded that, at the time of his appointment, his experience did not satisfy the requirements of Tennessee Supreme Court Rule 13. Mr. Johnston admitted that, prior to his appointment, he had never met Mr. Mosier.

Regarding his participation in the case, Mr. Johnston recalled being particularly involved in the motion for change of venue. Mr. Johnston collected various newspaper articles and attempted to procure affidavits from other attorneys verifying that it would be difficult to have a fair trial in Fayette County. He stated that he also assisted in numerous ex parte motions at the beginning of the representation in order to get a defense team together, i.e., investigator, clinical psychologist, and jury/mitigation expert. He stated that he provided no input as to what experts would be sought. Ultimately, the defense team consisted of Tammy Askew, the investigator; Dr. Lynn Zager, the clinical psychologist; and Julie Fenyes, the mitigation/jury consultant.

Mr. Johnston testified that he had few interactions with Ms. Askew. He did not provide her with instructions as to what to do or who to interview. Mr. Johnston did not recall meeting Dr. Zager "until the very end." However, he did recall a time in July when he had to take an "MMPI test up [to Tipton County], so I would have been working . . . with her at that time . . . ." Regarding Ms. Fenyes, he testified that Ms. Fenyes prepared the juror questionnaire. Mr. Johnston could not recall any conclusions regarding the jury based on Ms. Fenyes' work. Mr. Johnston stated that he was not

in a position where he was trying to provide the experts with direction. Rather, he was "trying to do what I was asked to do by Mr. Mosier . . . ."

In May 1998, when a jury trial was still contemplated, Mr. Mosier asked Mr. Johnston whether he would be willing to present the closing argument. Mr. Johnston, however, informed Mr. Mosier that he would be more comfortable if Mr. Mosier presented closing argument. Mr. Johnston stated that he was involved regarding the decision of whether to enter a plea and whether jury sentencing should be waived.

Regarding the waiver of a jury trial and entrance of a guilty plea, Mr. Johnston stated that they:

> [W]ere in a position at the point where we were fairly certain as to in terms of the probability that we'd be in a sentencing hearing, and I know that at that point we wanted to have as much mitigation as we could. And entering a plea certainly would have been a mitigating factor to be considered by the Court. So I think it dealt with an analysis at that point of aggravating factors, mitigating factors, and the likelihood that we would ultimately be in a sentencing hearing, given the proof that had been developed at that point.

> In terms of waiving a jury for sentencing, I think it was a situation where we wanted . . . at least we thought it would be in Mr. Henderson's best interest to have the Court do the sentencing.

It was the opinion of the defense team that Judge Blackwood was personally opposed to the death penalty and that was a point to consider regarding a plea. He added:

> From what I recall, we met with [the petitioner] and we talked about where we were. And it was decided that we would want the judge to do the sentencing in the event we ended up in a sentencing hearing. And I think there would have been a conversation at that point that we felt that the facts were not in our favor and that it was going to be very difficult to avoid a sentencing hearing.
>         . . . .
> And there was a decision made at that point that if the State agreed to allow the Court to do the sentencing, that that would be the way to proceed. And one thing led to another thing, and we were in court that afternoon and we entered the plea.

8

Mr. Johnston acknowledged the fact that they were no more prepared for sentencing at the time the plea was entered than they were earlier that morning when they had asked for and received a continuance from the court. The sentencing phase was scheduled for the following week. A meeting was held in Jackson with the entire defense team. At the meeting, all members presented the information they had gathered. The information was assimilated and organized in order to present a defense.

With regard to the petitioner, Mr. Johnston recalled that, during their initial meeting, the petitioner was "calm, . . . respectful, . . . pleasant . . . ." His opinion after this meeting was that the petitioner was going to be pleasant to work with during the case. Mr. Johnston stated that he was not satisfied with the results in this case. He expressed concern that the petitioner's family was not present at the time his plea was entered. In hindsight, he "wish[ed]" that a jury would have been empaneled and that they would have fought the case on the merits." Notwithstanding his belief, he could not state what else could have been done by the defense team related to sentencing.

On cross-examination, Mr. Johnston stated that the petitioner's mother never indicated that the petitioner had any sort of mental health issues or was mentally deficient. Mr. Johnston, through his interaction with the petitioner, was not able to discern any obvious indicators that the petitioner was unable to assist in his representation or suffered from any mental illness. Any information related to possible mental illnesses or deficiencies were solely limited to the opinions of Dr. Zager. Mr. Johnston conceded that the evidence as to the petitioner's guilt was overwhelming. He added that the defense team presented all evidence that they considered to be of mitigation value at the sentencing hearing.

On re-direct, Mr. Johnston stated that information that four (4) second cousins of the petitioner had been diagnosed with mental illnesses would have been very relevant and this information would have been passed to the clinical psychologist. He further conceded that information that the mother of these four (4) second cousins had a mental illness would be not only relevant to defense counsel but also to the court as well.

Mr. Johnston conceded that he had no prior knowledge or training as to what issues might raise flags to lead counsel when reviewing information on a capital defendant. He admitted that the fact that the petitioner stood accused of raping the mother of the woman he considered his girlfriend would certainly "raise a flag."

Lead counsel in this matter, Michael Mosier, testified that he had been a licensed attorney for twenty-seven (27) years. He explained that he was contacted by Judge Blackwood regarding appointment in this matter as there was no attorney in the district that could represent the petitioner due to potential conflicts. Mr. Mosier testified that the defense of a capital case is a "pretty awesome responsibility" and that he "considered Mr. Johnston's role to be more than just local liason." He

9

stated that he relied upon Mr. Johnston for the initial information about the case. Mr. Johnston was advised as to Mr. Mosier's normal procedure in a capital case, motions that would be filed, and expert assistance that would be sought. Mr. Mosier prepared all of the motions. Mr. Mosier selected the experts and investigators. He stated that he believed that expert services were granted in August 1997. He stated that Ms. Askew's function as the investigator was to make contact with persons having factual knowledge of the offense and to contact members of the petitioner's family. Ms. Fenyes' function as the jury/mitigation consultant was to conduct a social background investigation of the petitioner in order to prepare a mitigation investigation for possible use at a sentencing hearing. Ms. Fenyes also compiled jury questionnaires, reviewed the responses, and made recommendations as to which prospective venire members would be good jurors. Mr. Mosier stated that he visited the petitioner at Riverbend Maximum Security Institution approximately three (3) to four (4) times. He added that he visited the petitioner prior to his transfer to Riverbend.

Mr. Mosier recalled the petitioner informing the trial court by letter, dated June 24, 1998, that he was dissatisfied with Mr. Mosier's and Mr. Johnston's representation. Mr. Mosier visited the petitioner at Riverbend on June 30, 1998, in part, to discuss this letter with the petitioner.

On July 6, 1998, Ms. Fenyes informed Mr. Mosier that the mitigation evidence that she had gathered was not helpful and that she would need more time. Mr. Mosier "felt like that all that there was left for him was to try to demonstrate to the judge his acceptance of responsibility, and by putting him on the stand, let him show remorse for what he did." This information formed part of the basis for counsel's motion for continuance submitted on July 6. After the continuance was granted on July 6, Mr. Mosier, at the petitioner's request, approached the prosecution in an attempt to seek a life sentence in exchange for a guilty plea. Mr. Mosier stated, however, that the possibility of entering a guilty plea was discussed in December 1997. Indeed, the petitioner wrote counsel a letter asking about the benefits of entering a guilty plea. Specifically, he inquired as to whether his showing of remorse would persuade the judge to spare him the death penalty and get him a life sentence. Counsel received three (3) or four (4) letters of this nature. The first letter dated December 21, 1997, made inquiry as to pleading guilty and hoping for mercy. The next letter dated January 11, 1998, evidenced an apology to Deputy Bishop and his family, but noting that the death penalty should not be imposed. On January 14, 1998, a third letter was written by the petitioner asking what would happen to the other charges if he pled guilty to first degree murder. The petitioner added that the victim's family would be assured that he would never be eligible for parole. The letter further asked that the trial be moved to another county at a later date from the scheduled March 9, 1998, trial. The petitioner penned a fourth letter on January 23, 1998. In this letter, he again indicated a desire for a change of venue and recusal of the trial judge. Mr. Mosier stated that he discussed the trial judge's recusal with the petitioner and provided the petitioner with his strong recommendation that he not ask the trial judge to recuse himself. First, there was nothing in the record to warrant the request. Second, Judge Blackwood had previously stated on the record that he was morally and philosophically opposed to the death penalty. In other words, Mr. Mosier concluded that if he were able to hand-select a judge in a death penalty case, he would have selected Judge Blackwood. For these reasons, he did not seek recusal of Judge Blackwood. Mr. Mosier

10

stated that he did seek a change of venue in this matter. He stated that contact was made with Deputy Bishop's family. Investigator Pugh and Sheriff Kelly wrote a letter recommending that the death penalty not be imposed. The District Attorney's Office was informed on numerous occasions about the petitioner's willingness to accept a life sentence. In other words, Mr. Mosier "acted on what was valid, and what had no basis in law or fact, I took no action on."

Mr. Mosier testified that Dr. Zager was provided with everything in Mr. Mosier's file. Mr. Mosier stated that there is some indication that as of July 6, 1998, Dr. Zager had not yet evaluated the petitioner. Mr. Mosier stated, however, that at the time the plea was entered, he was mainly concerned about the insanity issue. There was no indication at this time that insanity would be a viable defense. The petitioner was not lacking in mental capacity, he was cooperative, well-mannered, polite, and his attorney worked with him easily.

Mr. Mosier stated that it was the petitioner's decision to waive a jury for sentencing. Mr. Mosier merely advised the petitioner of the advantages and disadvantages of waiving a jury in a capital sentencing trial. He stated that this case involved the "senseless killing of a law-enforcement officer." Mr. Mosier believed that the petitioner's "chances before a jury in any county were [not] good at all." In his opinion allowing Judge Blackwood to impose the sentence was the best chance that the petitioner had to avoid the death penalty.

Mr. Mosier stated that there were many difficulties with this case, primarily the status of the victim as a law enforcement officer and communication with the petitioner's family. The petitioner's mother, for example, refused to believe that her son could commit any criminal acts. Mr. Mosier was not aware of the incident alleging that the petitioner had kidnapped and raped his girlfriend's mother. He further conceded that the mitigation report failed to indicate that one of the petitioner's victims in a prior incident was his art teacher and the mother of his friends. Notwithstanding, Mr. Mosier could not say that knowledge of these factors would have been indicators for the need of further psychological or psychiatric testing.

Dr. Frank Einstein, a self-employed sentencing consultant and mitigation specialist, stated that there are two purposes of mitigation in capital cases. "One is to be able to present a picture of the client as a full human being to the sentencer. The second related part is to – the purpose of mitigation is to reduce the moral culpability of the defendant for the crime of murder for which he or she has been found guilty." In satisfying the second purpose, the person's entire life must be examined to determine whether there is anything biological, physiological or medical that may have interfered with a rational, constructive decision-making process.

In completing a mitigation investigation, Dr. Einstein testified that he begins two ways. One is to interview the client and the second involves reviewing life history records collected by the attorney. Under either method, a chronological history of the defendant's life is formulated. Any

11

records from schools, medical facilities, etcetera, are then collected to support the chronology. A picture of the family is then drawn. A list of names is created of people to interview. Where immediate family members fail to cooperate, extended family members should be interviewed. Moreover, records provide valuable information about the client. Finally, the investigator should continue an attempt to establish a rapport with immediate family members. Records of family members are also sought to establish certain familial patterns, for example of mental illness, abuse or molestation.

Dr. Einstein testified that once this information is gathered the mitigation specialist pieces the information into a chronological time line. The information is then synthesized to show patterns. This presents the mitigation specialist with a likely theme in the case or in the client's life. A social history is then compiled of the collected data to show the sequential development of the client's life. Dr. Einstein distinguished between the social history compiled by a mitigation specialist and that contained in medical records. He stated that social histories contained in medical records are based upon information provided by the patient and one or two family members. This type of social history is "totally uncorroborated." Thus, reliance upon this type of social history alone leads to the high possibility that one would miss serious clues that would trigger the need for further evaluation. Dr. Einstein stated that the compilation of an accurate social history could be completed in as short a time as one (1) year or could take as long as two (2) to three (3) years. It is highly unlikely that it could be completed in less than one (1) year.

Post-conviction counsel asked Dr. Einstein to review the work completed at the trial level in the petitioner's case and the adequacy thereof and compare that work with the investigation completed by the post-conviction team. In reviewing Ms. Fenyes' work, Dr. Einstein found it remarkable that almost all the work completed in her investigation was done two (2) weeks prior to the entry of the guilty plea. Dr. Einstein concluded that there was no mitigation work completed from June 1997 through December 1997. Ms. Fenyes only met with the petitioner four (4) times, and never alone. This is important because the ability to gain sensitive information is hindered when a third party is present. Ms. Fenyes did not meet with the petitioner until February 1998. There is no indication of any further meetings until June 1998. The petitioner entered a guilty plea on July 6, 1998. It is Dr. Einstein's opinion that the amount of time spent preparing a mitigation defense "would definitely not [have] been enough time in this case." Dr. Einstein acknowledged that Ms. Fenyes was not authorized to begin work until September 1997. Dr. Einstein further faulted Ms. Fenyes's practice of interviewing persons by telephone rather than in person. Basically, all of the mitigation work was completed in the week between entry of the plea and the sentencing hearing.

In comparing the mitigation investigation completed by the trial team and the mitigation investigation completed by the post-conviction team, Dr. Einstein observed information not discovered by the trial team that was available and useful in preparing a mitigation defense. Dr. Einstein separated the "missing" information into two categories, (1) information about Petitioner Henderson and (2) information about the petitioner's extended family. Information regarding the

12

petitioner consisted of the following: (1) changes in the petitioner's behavior during high school years; (2) radical changes in the petitioner's behavior during the two (2) years preceding the murder including but not limited to the alleged rape and kidnapping of his girlfriend's mother; (3) exhibitions of signs of depression and suicidal thoughts; and (4) indication of a strange sort of religious ideation, consisting of spirits that affect his behavior. Information about the petitioner's extended family included: a significant history of mental illness and instability, where at least nine (9) extended family members on both his maternal and paternal side suffered from mental illness. His report indicated that the petitioner should have been examined by a psychiatrist.

On cross-examination, Dr. Einstein conceded that his fee in this case would amount to $30,000 or $40,000. He stated that the fact that the petitioner has been diagnosed with a mental illness and the fact that this information was omitted at the trial level was prejudicial to the petitioner. He added that information regarding the family history of mental illness should have been presented. Dr. Einstein explained that this case was difficult for two (2) reasons. First, the petitioner was not honest regarding his family history, because he presented a picture of having a perfect family. Second, his family was very guarded and closed to outsiders.

Dr. Einstein conceded that the petitioner did not have an abusive childhood. Although the petitioner did have two (2) incidents of significant physical trauma, this information was procured by the trial team. There is no indication of childhood malnutrition. He further conceded that, at the time of trial, there was no mental health history of the petitioner and there was no evidence that he was mentally retarded. There is no evidence of fetal alcohol syndrome or effects. There is no evaluation completed by an addictionologist nor is there any indication that the petitioner had any kind of addiction. He agreed that there is no indication as to whether the petitioner had been exposed to lead, agricultural chemicals, or environmental toxins. Although these initial questions were answered negatively, Dr. Einstein stated that mitigation investigation does not end. Dr. Einstein conceded that, in any given case, there may exist several arguable issues that should be eliminated for the purpose of focusing on one (1) or two (2) stronger issues.

The trial judge himself made inquiry as to Dr. Einstein's qualifications. Dr. Einstein affirmed under questioning by the trial judge that his Ph.D. was in English. He further stated that he went from teaching English at Fisk University to being a specializing consultant and mitigation specialist. The trial court further questioned Dr. Einstein as to the manner of action taken when after interviewing four (4) or five (5) people there is nothing unusual discovered about the client. In response to questioning by the trial court, Dr. Einstein stated that he would continue to work for free in some cases, acknowledging that a court would refuse to grant more funds when there is no reason to support further investigation. The trial court also inquired as to the financial reasons motivating an investigator to continue seeking mitigation evidence if initial efforts prove unproductive.

David Louis Chearis testified that in late 1996 and early 1997 he was confined in the Fayette County Jail. Mr. Chearis served six (6) months in the jail, leaving the jail about a month and a half

13

before the murder of Deputy Bishop. During his confinement, he had the opportunity to observe the petitioner. Chearis knew the petitioner prior to incarceration, however, as the two men were "supposed to be some kin" and, generally, from "being on the streets." He also recalled publicity the petitioner received from playing basketball in high school.

Mr. Chearis noted that the petitioner was "like laid back and didn't really associate . . . with other inmates . . .and mostly stayed to himself, drawing . . . listening to his music. . . ." He observed that the petitioner slept most of the time, not rising until time to "get his 12 o'clock sandwich." This behavior of staying to himself persisted for about five-and-one-half (5 ½) months. He then changed. The petitioner started playing games, card games, arm wrestling, and other things. He starting getting out of bed earlier. He began associating with the other inmates. Mr. Chearis described the petitioner's changed behavior as "risky," explaining that when you started playing games you ran the risk of being in a fight. He further observed that the petitioner stopped "draw[ing] as much." Previously, he would draw pictures of his girlfriend, his mother and Michael Jordan, all people that he liked. After his behavioral change, he "got into a lot of tattoos."

On cross-examination, Mr. Chearis conceded that it was possible that the fact that the the petitioner was in possession of a handgun and was planning a murder was the reason behind his change in behavior.

Barbara Weddle, a retired school teacher, testified that she first encountered the petitioner in elementary school. Ms. Weddle was the fourth and fifth grade teacher at Central Elementary. Although the petitioner was not a student of hers, she knew of him because he "had a real good personality." In 1981, Ms. Weddle transferred to Fayette-Ware High School. At the high school, the petitioner was in Ms. Weddle's art class. Ms. Weddle recognized the petitioner's talent for drawing. She encouraged him to enter a contest about drawing the courthouse. The petitioner won the contest and won a dinner at a restaurant. Ms. Weddle always thought of the petitioner as "another Eddie Murphy. . . . He just liked to say funny things and make the kids laugh." She described him as playful, not disruptive. Ms. Weddle could not recall the petitioner's character other than that displayed in her classroom. Ms. Weddle could not recall being contacted by any person on the petitioner's trial team.

Larry Ransom, a teacher and the basketball coach at Fayette-Ware High School, testified that the petitioner played basketball under him at the high school. At the time, Coach Ransom was the assistant coach. He related that the petitioner was a very talented athlete and played hard. The petitioner was present at all practices and got along well with the other players. Coach Ransom could not recall any complaints about the petitioner from any of the teachers. He did state that, during his senior year, the petitioner concentrated more on his art work than on basketball. Despite the petitioner's passion for artwork, Coach Ransom was of the opinion that the petitioner could succeed at basketball at the college level.

14

On cross-examination, Coach Ransom recalled an incident where the petitioner placed something on the driveway of the school secretary. He also recalled an incident where the petitioner was involved in a fight on a school bus.

Although Tonya Whitmore went to high school with the petitioner, she did not actually meet him until after graduation when he was working at Sonic. Ms. Whitmore began dating the petitioner in 1993. She stated that, during the time they dated, she spent time with the petitioner and his family. She described the family as "pretty close," "pretty normal," and "[n]othing seemed out of the ordinary . . . ." During the first few months of their relationship, the couple would go places, have fun together, and the petitioner would paint pictures of Ms. Whitmore. At some point, the petitioner changed. He became very violent with her. Ms. Whitmore described one incident in January 1995 where the petitioner had come to her place of employment, broken into her vehicle, and waited for her. When Ms. Whitmore got into her car, [h]e drove around beating [her]." Ms. Whitmore ended up in the emergency room as a result of this incident. Ms. Whitmore initially did not tell anyone that the petitioner was the person that had inflicted the injuries upon her. Later that evening, Ms. Whitmore returned to the hospital and informed them that the petitioner beat her up and that he would kill her. Ms. Whitmore was placed in a room at the hospital until law enforcement officers arrived and made the petitioner leave. Ms. Whitmore later sought a protection order against the petitioner. Ms. Whitmore did have contact with the petitioner via telephone calls. She described these conversations as "[t]wisted, very twisted." She described the petitioner as being like two (2) different people. A few weeks later, the petitioner kidnapped Ms. Whitmore's younger sister, Tina. Ms. Whitmore testified that she broke up with the petitioner after the January 1995 beating, but later reconciled with the petitioner. She stated that she stayed with the petitioner after he started abusing her because he was a "good manipulator and a good conner . . . ."

Tempie Whitmore, Tina and Tonya Whitmore's mother, testified that her initial impression of the petitioner was that he was "odd, strange." She explained, "he just would stare at you and look at you right hard. . . . Looked like he was a little bit withdrawn . . . ." After the incident where Tonya was taken to the hospital, the petitioner telephoned Mrs. Whitmore at her place of employment, stating that he was sorry that he "beat Tonya up like that."

Willie Mae Henderson Armour, the petitioner's "great auntie," testified that her daughter, Cora Johnson, and two (2) of Cora's sons lived with her. Mrs. Armour stated that Cora was at Western State due to a nervous breakdown at the time of the birth of her twins, Penn and Glenn. Glenn Johnson, one of Cora's sons, was currently confined in the Somerville jail. Glenn had previously been hospitalized for mental problems. Mrs. Armour explained that Glenn had "been in and out of different places, and he got hurt in Cookeville, Tennessee, and that could be some of his problem." She stated that Glenn had been raped and it did something to his spine. Mrs. Armour was in the process of trying to get Glenn back into a mental hospital. She described particular incidents of Glenn's behavior, including an incident where he tore her front door off and stabbed his sister in the head.

15

In addition to Cora and her children's known mental illnesses, Mrs. Armour stated that another aunt, Amelia Winfrey, had "nerve – mental trouble," and her son, Arthur Peter Winfrey "died in Western State Hospital from mental illness." She added that her "great great auntie, Aunt Liza Winfrey, "lost her mind." Aunt Liza's son, Albert Springfield also "lost his mind, and he died in New York." She explained that "they'd just go wild." The mental illness apparently ran on both the maternal and paternal sides of the family.

Margaret Simmons is the sister of Elton Henderson. Ms. Simmons has never met the petitioner and only knows of him through articles relating the murder of Deputy Bishop.

Shirley Shelby testified that she had known the petitioner since he was eight or ten years old. The petitioner was friends with Ms. Shelby's sons. Ms. Shelby was also the petitioner's art teacher. She described him as an "exceptionally talented student." She added that he was also a talented athlete, specifically basketball.

Ms. Shelby related an incident where someone broke into her home and held a towel over her face. The person was wearing a ski mask and the house was dark as it was two o'clock in the morning. After chasing the intruder out of the house, Ms. Shelby and her daughters realized that their telephone lines had been cut. They decided to leave in her vehicle. The intruder chased the family away. The intruder then returned to Ms. Shelby's home and took "whatever purse he could find." Ms. Shelby then learned of checks having been written on her account. At some point, someone was able to identify the person who was writing the checks on Ms. Shelby's bank account. The person was identified as the petitioner. Ms. Shelby confirmed that in her recommendations for sentencing of the petitioner in this crime against her she recommended that he be provided psychological counseling.

Tammy Askew was retained as the investigator by the trial team in this case. She specifically recalled being contacted by Mr. Mosier prior to August 1997. She was instructed by both Mr. Mosier and Mr. Johnston to interview witnesses. Her understanding was that her investigation was limited to solely the guilt phase of the trial. Ms. Askew's records of her investigation reveal that on August 27, 1997, she interviewed Ms. Guy, Mr. Holmes, and Sally and TL Johnson. Her records also reveal that she attempted to interview Dr. Cima, Peggy Wilde and Donna Feathers; these witnesses refused to be interviewed. As advised by Mr. Mosier, Ms. Askew again attempted to interview these witnesses; they again declined.

Ms. Askew testified that she interviewed the petitioner's parents Sally and TL Johnson at their home. The couple were interviewed separately. An interview of the petitioner was then conducted. This was Ms. Askew's only interview with the petitioner. Ms. Askew conducted no additional investigative activities in this matter until June 1998. She explained that she had interviewed all of the persons that defense counsel had asked her to interview, with the exception

of those individuals that declined. She stated that defense counsel never asked her to interview anyone from the Sheriff's Department. Ms. Askew explained that after a defense team meeting on July 8, 1998, she researched criminal records of the petitioner and picked up some medical records on the petitioner.

Judge Blackwood was then called as a witness by post-conviction counsel. Judge Blackwood testified that from 1974 to 1976 he was in private practice in Fayette County. In 1975, he became a part-time assistant district attorney, going full-time in 1976. Judge Blackwood remained in this position until November 1985 at which time he was appointed to the bench. Judge Blackwood acknowledged that he had applied for the position of District Attorney General while employed with the District Attorney's Office.

Regarding an in camera conference between Judge Blackwood and Ms. Fenyes during the July 6, 1998, motion for continuance, Judge Blackwood stated that he questioned Ms. Fenyes as to how much more time she needed with regard to preparation of a mitigation defense. Trial counsel did not object to the conference.

Dr. Lynn Zager, a clinical psychologist, was retained by trial counsel to evaluate the petitioner. Dr. Zager testified that her evaluation of the petitioner began on November 4, 1997. Actually, Dr. Zager had previously traveled to Mark Luttrell in Shelby County to interview the petitioner, but he had already been transferred to another institution. On November 4, Dr. Zager spent three (3) hours at Riverbend completing a forensic evaluation of the petitioner. The purpose of this evaluation involved informing the petitioner of the purpose of the evaluation and the limits of confidentiality. She explained that her evaluation consisted of a social history, a competency assessment, and a "mental condition at the time the offense is said to have happened" assessment. Throughout this process, Dr. Zager is looking for signs and symptoms of a mental illness, personality disorder or other mental issues. Dr. Zager testified that, on this date, she did not complete any social history information.

On January 7, 1998, Dr. Zager reviewed the petitioner's medical records from LeBonheur Children's Hospital. Dr. Zager recalled the petitioner being involved in a bicycle accident when he was twelve (12) years old. The Petitioner had been hit by a car and was rendered unconscious. At this point, Dr. Zager provided her opinion to defense counsel that the petitioner was competent to stand trial and there was insufficient evidence to support a defense of insanity. She added that she did not have information to diagnose a major mental illness.

Dr. Zager testified that after the entry of the petitioner's guilty plea, the defense held a team meeting. During this meeting, there was discussion about the possibility of a personality disorder existing, specifically with narcissistic and antisocial traits. Dr. Zager decided to further pursue these disorders. Prior to July 8, 1997, Dr. Zager did not conduct any formal psychological testing. After

17

this meeting, Dr. Zager administered the MMPI to the Petitioner and evaluated the results. Between the team meeting and the administration of the MMPI, Dr. Zager had not been provided any more social history information on the petitioner. Dr. Zager had not been provided letters written to trial counsel by the petitioner. Notwithstanding, Dr. Zager testified that she felt comfortable with the amount of social history she had been provided. She did concede, however, that in other cases, the mitigation specialist had provided her with information as to the client's social history. Dr. Zager stated that information as to extended family histories involving alcoholism, mental health, and other issues are helpful and valuable tools. She added that, depending on the case, information gained from interviews with extended family members and people in the client's community could be significant in looking at a person's mental health.

A team meeting held on July 10 consisted of Dr. Zager, Mr. Mosier, Mr. Johnston, and Ms. Fenyes. The petitioner's mother attended this meeting and brought with her a box of things thought to be helpful or valuable in terms of preparing for the sentencing hearing. Dr. Zager could recall items of artwork most vividly. She recalled that a plan was formulated as to what would be presented at the hearing. Dr. Zager had determined that the petitioner suffered from a personality disorder with narcissistic and antisocial traits. This information was discussed at the meeting. Her evaluations, however, did not meet the specific diagnosis for these disorders. Dr. Zager testified that she was surprised that she was asked to testify at the sentencing hearing because her diagnosis of the petitioner did not constitute a major mental illness, in other words, her diagnosis was not very valuable in asserting a defense.

Since the initiation of post-conviction proceedings, Dr. Zager had been advised of additional information regarding the petitioner that she was not aware of at the time of her diagnosis. She stated that she learned "a whole lot of additional background information," including details of the different crimes for which the petitioner had been charged and convicted. Specifically, she was provided the victim's point of view of the incidents. Dr. Zager noted that the petitioner's art teacher was the victim of one of his prior crimes. She stated that any additional information would have been used in evaluating or refining her diagnosis

Dr. Zager testified that she was aware that the petitioner had been diagnosed with a Bipolar 2 disorder. She stated that this diagnosis was not inconsistent with the MMPI previously administered to the petitioner. On cross-examination, Dr. Zager explained that Bipolar 2 is a mood disorder and is not a psychosis. She added that a person can be diagnosed as Bipolar 2 and be a functioning member of society without antisocial or criminal traits.

Although Dr. Zager stated that she had not made a new diagnosis in this case based on new information, she agreed that it would be prudent to continue to look and see if there was a reason to change her prior diagnosis.

18

Dr. Pamela Auble, a clinical psychologist, explained that the role of an expert is to evaluate the client, sometimes recommending further experts. A major part of the function is to consult with the attorneys and the mitigation specialist. She described the role as an "ongoing process," because the evaluation may lead to new questions, additional records, additional consultations with the team, new information, and so on.

Dr. Auble stated that the MMPI is a personality test consisting of 567 true or false questions. Mainly, the questions are about various aspects of human experience. The test has some mental ability limitations, that is, you have to be able to read and understand the questions. Additionally, the test is only a "snapshot" of how the person taking the test is at that moment. She stated that the MMPI, on its own, is not a sufficient tool for providing a full picture of a person's psychology because; (1) it does not measure a person's abilities, thinking, reasoning or memory; (2) it is dependent upon the person's ability to describe themselves; and (3) no single test is the answer for everything. Dr. Auble confirmed the importance of the evaluator personally interviewing the client.

Dr. Auble testified that she was involved in the petitioner's case. She interviewed the petitioner, performed a battery of tests, and reviewed some records about his history. She further attested that she had consulted with post-conviction counsel and talked with various persons about the case, their findings, and other aspects of the petitioner's history. Specifically, Dr. Auble administered the Wechsler Memory Scale Third Edition, the Weschler Adult Intelligence Scale Third Edition, the Test of Memory Malingering, the Wisconsin Card Sort, Trailmaking, the Speech Perception Test, the Seashore Rhythm Test, the Tactual Performance Test, the California Verbal Learning Test, the Rey-Osterrieth Complex Figure, the Delis-Kaplan Executive Functioning System, the Finger Oscillation Test, the Grooved Pegboard Test, the Rorschach, the Personality Assessment Inventory, and the Incomplete Sentences Blank. Dr. Auble further reviewed the testimony and notes of Dr. Zager, the records from LeBonheur Children's Medical Center, the report of Dr. Einstein, and a transcript of the sentencing hearing. The review of these materials was completed after Dr. Auble's report was prepared but had no affect on her conclusions. Dr. Auble provided the following test results:

> The testing of the mental abilities told me that [the petitioner] does not have what I would call global or general deficits, but does have some specific problems in his mental abilities.

> To be exact, he has some difficulties learning information that he's told. That's a problem for him. He also had some problem in a test of manual dexterity, and he had some variable problems on tests which measure his ability to go back and forth between different ideas, to form hypotheses and test them, and to abstract reasoning.

From the personality testing, [the petitioner] has a desire to present himself as a very normal, even maybe supernormal individual. He is likely to minimize or even be unaware of his own problems. He likes people and wants interaction with people. He – in my testing he was less distressed than he was when Dr. Zager saw him. I guess that's sort of a quick summary.

Dr. Auble explained that her findings of neuropsychological deficits was significant because they affect his functioning. She stated that:

[F]rom the personality testing it was hard for me to draw a lot of conclusions because of his tendency to shut down and to minimize problems, to . . . I don't know that he really has much insight into what his real problems are. So from the personality testing I'm not sure I got underneath, underneath his sort of mask of normalcy that he wants to portray to everyone. . . . I don't think he was as depressed at the time I saw him [as he was when Dr. Zager saw him].

There were indications however that his functioning was not right and his portrayal of himself and his family is inconsistent with reality. Dr. Auble believes that the petitioner is not "aware of his own emotional dynamics."

In comparing her results with those reached by Dr. Zager, Dr. Auble noted that Dr. Zager did not perform some of the testing of mental ability and, therefore, she did not talk about the problems with the petitioner's memory and his rigidity. She did concede that the personality style identified by Dr. Zager was similar to the personality style observed in her evaluation. Dr. Auble further agreed with Dr. Zager's diagnosis as to the petitioner's narcissistic traits and antisocial personality. She conceded that she was unable to diagnosis the petitioner with an Axis I diagnosis of a major mental disorder.

Dr. William Kenner, a psychiatrist engaged by post-conviction counsel in this case, testified that in formulating his opinion he reviewed:

[Q]uite a stack of material . . . which involved the interviews that had been done with his family members. I also – and other individuals who had known him over the years. I also had a chance to talk with Shirley Cobb and Tina Whitmore and Tina's mother, Tempie Whitmore, to get their views and experiences with [the petitioner].

In Dr. Kenner's opinion, the petitioner suffered from a bipolar type 2 disorder at the time of Deputy Bishop's murder. He continued to describe bipolar disorder:

One way to think about bipolar disorder is in terms of the cruise control on a car. The human brain has its own cruise control that sets the pace of our lives, the pace at which we think, act, and so forth. And, you know, some of us have cruise controls that are set quite differently. Some people are slow talking, and others talk very quickly and move on to things and so forth.

But when that cruise control becomes defective, some interesting changes take place in an individual. They begin to feel too good. Their thinking can race ahead, oblivious to any warning signs that they would otherwise have heeded when they were in their normal state. They don't need as much sleep as others. And the more manic they get, the less sleep they will need. What often goes with the fast thinking is extremes in the manic's opinion of himself, that it will become grandiose, his thinking will become expansive, and he will feel wonderful in circumstances that most folks would feel pretty just the opposite.

The manic patients have the normal human appetites, but they go overboard in terms of pleasure seeking, in terms of having a good time, and they will do this heedless of any consequences. . . . The manic will be unable to use good judgment to slow down and reflect on a particular course of action. . . . He may break the law in ways that he would not have done when he was on a more even keel.

Dr. Kenner related the traits of a manic to those of one with a narcissistic personality disorder, stating that a "manic is like a narcissist on methamphetamines." He stated, however, that a narcissist is one who puts himself out as being a rather special person, while a manic, when the mania is over, will resume their normal personality. Regarding the diagnosis of antisocial personality disorder, Dr. Kenner stated that symptoms of this trait begin at age fifteen (15). These traits were not evident in the petitioner. The petitioner was very conscientious and hard working in school.

Dr. Kenner stated that the marked change in the petitioner's personality in early adulthood suggests several things including the use of drugs or the start of a mental illness. There was no indication that the petitioner abused drugs. Dr. Kenner based his diagnosis primarily upon the petitioner's behavior during childhood and high school compared to his behavior in his early adulthood years. Dr. Kenner considered the petitioner's extracurricular activities, noting that he played basketball all four (4) years, he ran track, he was president of the 4-H and the student body at high school, he participated in the art club, he coached and played in the Fayette County Athletic League. Based upon his performance to this point, the petitioner showed great promise, that is, before his bipolar symptoms came into play. There were some signs in high school, specifically sleep disorder systems. His criminal career began with the forging of a Tennessee Department of Employment Security check. The check was made for $104, and the petitioner added a five (5) in front of the amount, making it $5,104. In February 1995, he raped Shirley Cobb, the mother of his girlfriend. The petitioner described his girlfriend Natonya as his wife. In March 1995, he broke into

Shirley Shelby's home and stole some purses. In May 1995, he abducted the younger sister of a former girlfriend.

Other events proved insightful in making a diagnosis. In October 1995, the petitioner placed a wedding announcement in the local paper stating he and Natonya were to be married and giving her last name as Boyland. The announcement further provided that the wedding was to take place on October 14, 1995, at the Adams Mark Hotel with an elegant reception afterwards. Information in the announcement also indicated that the couple were soon to be parents of a baby boy, that Natonya was going to sign a contract with a modeling agency, and that the petitioner was pursuing his art career at the Naegele Outdoor Advertising Company. There was absolutely no truth in the announcement. They were not getting married; she was not pregnant; he was working at Target; he was not pursuing an art career; and Natonya was not signing a modeling contract.

On December 27, 1995, the petitioner was released from jail at 1:17 p.m. By 4:00 pm, he had again abducted Shirley Cobb and raped her. The abduction was in daylight in front of somebody's house. The petitioner began to serve a sentence for aggravated burglary in January 1996. He was on work release in February 7, 1996, when he again abducted Shirley Cobb. On February 9, he released her. Two (2) months later, the petitioner was arrested in Conway, Arkansas, with Natonya Cobb.

Dr. Kenner opined that these events are significantly different from behavior earlier in his life. His family history is heavily loaded for bipolar disorder. The murder of Deputy Bishop occurred during a period of difficulty in sleeping. Moreover, like the other crimes committed by the petitioner, this offense did not make any sense, shooting a deputy and escaping through the middle of town. He stated that Mr. Chearis' description of the petitioner's behavior while at the Fayette County Jail was consistent with a diagnosis of bipolar disorder 2.

Dr. Kenner concluded that, in his opinion, the petitioner was suffering from a major medical illness that affected his abilities to control his behavior in this case. He added that someone suffering from a bipolar disorder would have more difficulty in avoiding this type of criminal behavior than a person without a mental illness. Dr. Kenner stated that the most convincing evidence as to the diagnosis that the petitioner was suffering from bipolar disorder at the time of the murder is the presence of the sleep disorder. However, he placed equal importance on the family history of mental illness and the petitioner's presentation that he had a perfect family. He stated that the illness could be supported without the two (2) year history of criminal behavior, but it is much more convincing with the history.

On cross-examination, Dr. Kenner conceded that his information of the petitioner's sleep history was based on the self-report of the petitioner. He related, however, that bipolar disorder was not a mental illness easily or readily "faked" by persons. Dr. Kenner further admitted that none of

the petitioner's first-degree biological relatives had bipolar disorder. He stated, however, that there is relevance of a second cousin suffering from a mental illness, but he conceded, this relevance is not recognized in the DSM4.

## *Findings of the Post-Conviction Court*

In its order denying post-conviction relief, the post-conviction court summarized the facts supporting the petitioner's conviction for the first degree murder of Deputy Bishop. The post-conviction court noted that numerous pre-trial motions were filed by defense counsel, including motions for ex parte services. These motions were granted by the trial court. The post-conviction court further acknowledged that the trial was originally scheduled for July 6, 1998, but, immediately prior to the commencement of the trial, defense counsel sought and was granted a continuance. Later that day, after an extensive hearing, the petitioner entered a plea of guilty to first degree murder. After further questioning, the petitioner waived his right to have a jury impose punishment. A capital sentencing hearing was conducted one (1) week later. At the conclusion of which, the trial court imposed a sentence of death.

The post-conviction court acknowledged the petitioner's claims regarding the ineffective assistance of trial and appellate counsel. In this regard, the post-conviction court made the following findings of fact and conclusions of law:

> First, this case occurred before Rule 13 of the Supreme Court became applicable. Nevertheless, Mr. Mosier had experience in capital cases, and Mr. Johnston had impressed the Court with his legal acumen, despite his lack of experience. Secondly, there is nothing in the record to suggest that the Petitioner did not voluntarily, knowingly, and intelligently waive his right to a jury trial on the issue of punishment. The record indicates that he initially suggested to trial counsel that he plead guilty. Thirdly, there are very few factual issues of importance that are disputed. Lastly, the Court, having been the trier of fact during the punishment phase, is in a unique position to be able to hear any additional mitigating evidence and weight [sic] it against the evidence at trial. This is important in determining whether any additional mitigating evidence would have changed the Court's sentence.

> [T]he Court finds that Petitioner was not denied effective assistance of counsel. Counsel filed all the appropriate motions. Counsel was provided with expert services. Counsel allowed the investigative and mitigation expert to conduct their investigation and report to counsel their findings. It is true that trial counsel was not aware of all the history of mental illness in the Petitioner's family. Also true was that counsel was not completely aware of some of the violent events that the Petitioner engaged in shortly before this incident. It is true that counsel was aware

23

from the expert clinical psychologist that Petitioner was diagnosed with a personality disorder, not otherwise specified, with narcissistic traits. However, their expert did not see any bipolar tendency, and counsel, under the circumstances, acted in a competent manner in presenting this psychological proof to the Court. It is true that counsel's mitigation expert did not make as an extensive mitigation investigation as Post-conviction mitigation expert opined was necessary. However, two points need to be addressed. One, there was a mitigation investigation and a review of the trial transcript revealed that various witnesses testified on Petitioner's behalf in an effort to produce mitigation. Secondly, the Court places little weight on the testimony of Petitioner's mitigation expert, especially when he opined that it would take two to three years to do a proper mitigation investigation. Lastly, as trial counsel stated, this was a case where finding mitigation was difficult, and as explained hereinafter, also a double-edged sword. Therefore, the Court concludes that counsel was not ineffective.

     . . . .

The Court can now look to the additional mitigation proof offered at this hearing in assessing whether the result would have been different. . . . The Petitioner was a normal student in grammar and high school. He was a talented basketball player and had a talent for art. About two years prior to this event, his behavior changed. He became violent. He viciously assaulted one girlfriend. He was convicted of some lesser felonies. Thereafter, he abducted the mother of his girlfriend on several occasions while masked. He also raped the mother. Petitioner's clinical psychologist opined that he had a personality disorder, but did not . . . disagree with trial counsel's clinical psychologist, other than she administered more tests. Finally, Dr. Kenner diagnosed the Petitioner as bipolar. . . . Dr. Kenner opined that in order to fully explain the nature of Petitioner's bipolar diagnosis, the trier of fact would have to hear all the details of Petitioner's various assaults, abductions and rapes.

     . . . .

[T]he statutory aggravating circumstances . . . by the State were simply overwhelming. The Court considered the mitigating testimony, especially the testimony regarding this personality disorder. This proffered new mitigating testimony regarding Dr. Kenner's bipolar diagnosis, only reinforces the Court's opinion that the aggravating circumstances outweighed, in fact overwhelmed, any mitigating evidence. . . . The Court is assuming . . . that Dr. Kenner's diagnosis is correct. Had this testimony been offered at the trial, the State, of course, would have had the opportunity to rebut same. . . . Secondly, the evidence presented regarding the defendant's abduction of his girlfriend's mother, the rapes, the assaults, lead the Court to the conclusion that the Petitioner's acts were calculated, cold and deliberate. These are the same calculated and deliberate actions that led to the death of Tommy Bishop. Whether or not they were the result of a bipolar condition would not have changed the Court's decision to impose a sentence of death.

24

Lastly, Appellate counsel was not ineffective given the history of the case. The only viable issue to appeal was pre [sic] portionality.

### *Post-Conviction Standard of Review*

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction is void or voidable because of an abridgement of a constitutional right. Tenn. Code Ann. § 40-30-103. The petition challenging the conviction for first-degree murder herein is governed by the 1995 Post-Conviction Act, which requires that allegations be proven by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). Evidence is clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from the evidence. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

Once the post-conviction court has ruled upon a petition, its findings of fact are conclusive on appeal unless the evidence in the record preponderates against them. Wallace v. State, 121 S.W.3d 652, 656 (Tenn. 2003); State v. Nichols, 90 S.W.3d 576, 586 (Tenn. 2002) (citing State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999)). This Court may not reweigh or reevaluate the evidence or substitute its inferences for those drawn by the post-conviction court. Nichols, 90 S.W.3d at 586. Questions concerning the credibility of witnesses and the weight to be given their testimony are for resolution by the post-conviction court. Id. (citing Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997)). Notwithstanding, determinations of whether counsel provided a defendant constitutionally deficient assistance present mixed questions of law and fact. Wallace, 121 S.W.3d at 656; Nichols, 90 S.W.3d at 586. As such, our review is de novo, and we accord the conclusions reached below no presumption of correctness. Wallace, 121 S.W.3d at 656, Nichols, 90 S.W.3d at 586.

### *I. Issues Waived by Guilty Plea and/or Failure to Raise Them on Direct Appeal*

In this appeal, the petitioner raises a number of issues centering around both the trial court's refusal to recuse itself during both the guilt and the sentencing phase as well as constitutional error with the imposition of the death penalty. Specifically, with regard to the death penalty, the petitioner argues that: (1) his sentence of death violates international law; (2) his sentence of death violates due process; (3) his waiver of jury sentencing was invalid; (4) the death penalty itself is unconstitutional; and (5) the system of appointing capital defense counsel is unconstitutional. A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented unless it is based upon "a constitutional right not recognized as existing at the time of trial if either the federal or state constitution requires retroactive application of that right" or the failure to present the ground "was the result of state action in violation of the federal or state constitution." Tenn. Code Ann. § 40-36-106(g). Neither of the exceptions is present herein. Further, the petitioner pled guilty. A guilty plea waives all non-jurisdictional constitutional inequalities. See State v.

McKinney, 74 S.W.3d 291 (Tenn. 2002). Thus, these issues are waived. Accordingly, the only remaining issues properly before this Court involve the trial court's failure to recuse itself at the post-conviction proceeding, the effectiveness of trial and appellate counsel, and the post-conviction court's decision to exclude the testimony of Kelly Gleason.

## II. Recusal of the Court at the Post-conviction Level

The petitioner complains that the post-conviction judge erred in failing to recuse himself from the post-conviction proceedings. As basis for recusal, the petitioner asserts that: (1) the judge predetermined post-conviction issues at the petitioner's original trial; (2) the post-conviction judge demonstrated bias by its attitude and behavior regarding defense witness Dr. Einstein; (3) the post-conviction judge refused to permit the defense to call his secretary as a witness so as to not disrupt its office, although defense counsel had properly subpoenaed her; and (4) the judge's disparate treatment of witnesses.

In support of these claims, the petitioner offers the following. The petitioner alleges that the judge began predetermining post-conviction issues during the original trial of this matter. Specifically, the petitioner cites to the trial judge's questioning of Ms. Fenyes with hypothetical questions regarding whether there was sufficient mitigation investigation to support a finding that trial counsel was effective. The petitioner further asserts that the judge's predetermination of counsel's effectiveness is evidenced by the post-conviction judge's conduct during the testimony of Dr. Frank Einstein, the post-conviction defense mitigation specialist. The petitioner claims that the trial judge took notes during Dr. Einstein's testimony and contemporaneously "smiled" at the prosecutors. The petitioner also cites to the post-conviction judge's questioning of Dr. Einstein concerning his change of careers from a teacher to the more lucrative career of a sentencing mitigation specialist. The following is an excerpt from the post-conviction judge's questioning of Dr. Einstein:

> THE COURT: I wonder why you left the position [teaching] at Fisk to go into the criminal justice system.
>
> DR. EINSTEIN: Well, there were very many reasons. I made a career change at that time. To continue teaching, I would have had to have moved around, you know, out of Nashville. And by that time my wife and I had two small children. And this, an opportunity came up which I decided to take advantage of.
>
> THE COURT: Would it also be fair to say that about that time that the criminal justice system's compensation became more lucrative?
>
> DR. EINSTEIN: I don't know about that.
>
> THE COURT: Would it be fair to say that since 1997, when Tennessee has adopted the federal rules which have all these funds for mitigation experts and so forth, that

your income has greatly increased since 1997?

DR. EINSTEIN: I don't think it has greatly increased.

THE COURT: If you go and you interview four or five witnesses and you find no mitigation or nothing to help you, one of the reasons that you would continue to try to find mitigation experts is if you're being paid, the cash register will continue to run, won't it?

DR. EINSTEIN: That wouldn't be the reason. The reason would be that I would have taken on the commitment to do a task and there being four or five people in that task.

The petitioner also challenges the post-conviction judge's refusal to allow post-conviction counsel to call Becky Pitts, the judge's secretary, as a witness. Ms. Pitts had been properly subpoenaed by post-conviction counsel. Ms. Pitts' testimony was allegedly necessary in regards to a letter sent by the petitioner to the trial judge requesting new attorneys. Despite the petitioner's protest to the contrary, the post-conviction judge stated that anything relating to the petitioner's letter was already contained in the record and there was no need for more evidence about that issue. The post-conviction judge further stated that "it is disrupting my office for her to be over here." When post-conviction counsel argued that the petitioner had a right to confront and to present testimony in his behalf, the post-conviction judge responded that "I rule that Ms. Pitts' testimony is not relevant."

Additionally, although not specifically challenged by the petitioner, the record indicates that the post-conviction judge was a witness in this case. Post-conviction counsel announced their intent to call the post-conviction judge as a witness. The following colloquy occurred:

MR. DAWSON: Your Honor, we do have some questions that we intended to ask the Court . . . that we indicated that we needed the Court as a witness. We do have questions for the Court, if the Court would allow that.

THE COURT: It's never happened before, I suppose. All right, sir.

Swear me, Mr. German.

GENERAL FREELAND: Your Honor, I think I'm going to object unless there's some waiver on the part of the petitioner that this will not be in itself a basis for recusal of Your Honor. It seems to me that this is all part of the process that's been renewed today from yesterday to have Your Honor recuse himself. And if you're called by him as

a witness and he says —

THE COURT:          I think I have to recuse myself.

GENERAL FREELAND:          Yes, sir.  Your Honor, I understand his basis, . . . for Your Honor to recuse yourself, in which Your Honor has already ruled.  But if a further basis is going to be that Your Honor is a witness, I'm going to object to his calling you as a witness.

THE COURT:          All right, sir.

MR. DAWSON:          Your Honor, that was, of course, what we had indicated prehearing or at the beginning of the hearing, is that we would need to call the Court as a witness, and that was, of course, one of the grounds that we gave for recusal.  The Court denied that motion, and we still need the Court as a witness.

GENERAL FREELAND:          I take that as a waiver, Your Honor.

MR. DAWSON:          Your Honor, I don't think that's a waiver.  We made the motion.  We had indicated the Court needed to recuse itself for that reason.  The Court refused to.  I think [the petitioner] still needs the Court as a witness, and if that means the Court cannot then do the opinion in this case, then that's where we are in this matter.

GENERAL FREELAND:          Yes, sir.  And, Your Honor, rather than this just be[ing] a fishing expedition, since this is unprecedented as far as I know, I'd like to have some sort of offer of proof as to what Mr. Dawson is going to ask.

THE COURT:          Yes, sir.

The judge was sworn and testified regarding his legal career and political aspirations.  Post-conviction counsel questioned the judge regarding the in-chambers conference with Ms. Fenyes.

28

In this regard, the judge responded that there had been no objection to this procedure by trial counsel. He related that the in-chambers conference was limited to a discussion regarding how much more time Ms. Fenyes would need to procure mitigation evidence. At the conclusion of this testimony, post-conviction counsel unsuccessfully renewed the motion for the court's recusal.

A fair trial in a fair tribunal is a basic requirement of due process. The principles of impartiality, disinterestedness and fairness are fundamental concepts in our jurisprudence. See State v. Bondurant, 4 S.W.3d 662, 668 (Tenn. 1999) (quoting State v. Lynn, 924 S.W.2d 892, 898 (Tenn. 1996)). Article I, Section 17 of the Tennessee Constitution and the Fourteenth Amendment to the United States Constitution guarantee all litigants a hearing before an impartial decision-maker. In re Cameron, 151 S.W. 64, 76 (1912); see also Tumey v. Ohio, 273 U.S. 510, 532 (1927) (stating that "every procedure which would offer a possible temptation to the average man as a judge [to forget the burden of proof required to convict the defendant, or which might lead him] not to hold the balance nice, clear and true between the State and the accused, denies the latter due process of law"). Article VI, Section 11 of the Tennessee Constitution states that judges cannot participate in cases in which they might have even the slightest interest. Neely v. State, 63 Tenn. 174, 182 (1874). A similar restriction appears in Tennessee Code Annotated section 17-2-101(1). The purpose of these provisions is to guard against the prejudgement of a litigant's rights and to avoid situations in which the litigants might believe that the court reached a prejudiced conclusion because of interest, partiality or favor. Chumbley v. Peoples Bank & Trust Co., 57 S.W.2d 787, 788 (Tenn. 1933). A trial before a biased or prejudiced judge is a denial of due process. Wilson v. Wilson, 987 S.W.2d 555, 562 (Tenn. Ct. App. 1998).

Judges must not only be impartial, but also appear impartial because judicial fairness is violated when the appearance of fairness is ignored. See State ex rel. McFerran v. Justice Court of Evangeline Starr, 202 P.2d 927 (Wash. 1949). This is not merely an idealistic sentiment. Deference to the judgments and rulings of the courts depends upon public confidence in the integrity and independence of the judges that make them. As our supreme court has acknowledged:

> It is of lasting importance that the body of the public should have confidence in the fairness and uprightness of the judges created to serve as dispensers of justice. The continuance of this belief, so long entertained by the people of this country, and so well warranted by the history of the judiciary as a body, is largely essential to the future existence of our institutions in their integrity.

In re Cameron, 151 S.W. at 76. Since what the public perceives may be substantially different from what actually exists, it is the appearance of impartiality that will often undermine or resurrect society's faith in the judicial system. See Bondurant, 4 S.W.3d at 668 (quoting State v. Lynn, 924 S.W.2d 892, 898 (Tenn. 1993) (citing Offutt v. United States, 348 U.S. 11, 14 (1954))). Thus, "justice must satisfy the appearance of justice." Id.

29

Canon 2A, Tennessee Supreme Court Rule 10, requires judges to conduct themselves "at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." Similarly, Canon 3(E)(1), Tennessee Supreme Court Rule 10, requires judges to disqualify themselves in cases where their "impartiality might reasonably be questioned." The strict application of Canon 3(E)(1) may result in the disqualification of a judge who has no actual bias and who believes that he or she can try a case fairly. See In re Murchison, 349 U.S. 133, 136 (1955). The test is not whether the judge believes he or she can be impartial but rather whether others might reasonably question the judge's impartiality. Lackey v. State, 578 S.W.2d 101, 104 (Tenn. Crim. App. 1978). Thus, even where a just result is achieved, the appearance of justice is lost when the judge appears biased or partial to one party. See generally Offutt, 348 U.S. at 14 (stating that "justice must satisfy the appearance of justice").

A trial judge should recuse himself or herself whenever the judge has any doubt as to his or her ability to preside impartially or whenever his or her impartiality can reasonably be questioned. Pannell v. State, 71 S.W.3d 720, 725 (Tenn. Crim. App. 2001). This is an objective standard. Alley v. State, 882 S.W.2d 810, 820 (Tenn. Crim. App. 1994). The appearance of impropriety is conceptually distinct from the subjective approach of a judge facing a possible disqualification challenge and does not depend on the judge's belief that he or she is acting properly. See Liteky v. United States, 510 U.S. 540, 553, n.2 (1994) (determining that "[t]he judge does not have to be subjectively biased or prejudiced, so long as he appears to be so"). "Thus, while a trial judge should grant a recusal whenever the judge has any doubts about his or her ability to preside impartially, recusal is also warranted when a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality." Alley, 882 S.W.2d at 820. The trial judge retains discretion over his or her recusal. State v. Smith, 906 S.W.2d 6, 11 (Tenn. Crim. App. 1995). Unless the evidence in the record indicates that the failure to recuse was an abuse of discretion, this Court will not interfere with that decision. State v. Hines, 919 S.W.2d 573, 578 (Tenn. 1995).

It is difficult, if not impossible, for an appellate court to conduct a meaningful review of a trial court's discretionary decision without knowing the basis for the trial court's action. In no circumstance is this more true than when the impartiality of a judge is in question. In these cases, it is simply not sufficient for an appellate court to presume that there exists adequate support for the trial court's decision. The integrity of our judicial system demands actual reviewability in these matters. Thus, an appellate court must view the facts and circumstances through the eyes of the average man on the street.

The issue of a post-conviction judge's partiality or the appearance of it when the judge himself testifies was addressed previously by this Court in Harris v. State, 947 S.W.2d 156 (Tenn. Crim. App. 1996). In Harris, the petitioner sought the recusal of the post-conviction judge because: (1) the judge was seeking the office of the United States Senator; (2) the judge was a material witness with respect to the issues raised in the post-conviction proceeding; and (3) the impartiality

of the judge could reasonably be questioned. <u>Harris</u>, 947 S.W.2d at 171. Specifically, the petitioner argued that the post-conviction judge had personal knowledge of disputed facts because he served as the trial judge. <u>Id.</u> Although not contained in this Court's opinion, it appears that the post-conviction judge made comments during the post-conviction proceedings that led the petitioner to believe that he was biased in favor of the State. While acknowledging that a trial judge cannot both preside at a post-conviction proceeding and serve as a witness in that proceeding, this Court concluded that "the judge was not a significant source of information at the hearing, nor was the judge's decision ultimately influenced by that information." <u>Id.</u> at 173. This Court also noted that adverse rulings are usually an insufficient basis upon which to find bias. <u>Id.</u> While not condoning the judge's actions and remarks at the post-conviction hearing, this Court concluded that the judge's conduct did not "diminish the overall fairness of the proceeding, even applying the heightened standards of due process applicable in a capital case." <u>Id.</u> (internal citations and footnote omitted).

In the present case, the petitioner asserts that the post-conviction court advocated the State's interests by openly attacking the credibility of Dr. Einstein and by refusing to permit the petitioner to call the judge's secretary as a witness. He contends that these actions are exacerbated by the trial court's apparent predetermination of post-conviction issues during the trial proceedings and the post-conviction judge's disparate treatment of witnesses.

At the conclusion of Dr. Einstein's testimony, the post-conviction judge questioned Dr. Einstein about his motives for changing careers from teaching at a university to becoming a mitigation specialist and sentencing consultant. The petitioner argues that, by questioning the witness at length, taking notes during his testimony and "smiling" at the prosecutor during the testimony, the post-conviction judge created the appearance that he was taking sides.

A trial judge ordinarily has a duty to question a witness to clarify any issues for the jury. <u>See</u> <u>State ex rel. Com'r Dept. of Trans. v. Williams</u>, 828 S.W.2d 397, 403 (Tenn. Ct. App. 1991). In the case herein, however, there was no jury. In <u>Bowling v. Commonwealth</u>, 80 S.W.3d 405 (Ky. 2002), the Kentucky Supreme Court upheld the trial court's refusal to recuse itself after the trial court questioned certain witnesses at length. The defendant in <u>Bowling</u> posited an argument similar to the petitioner herein, that, by questioning the witnesses, the trial court became a material witness at the hearing and should have recused itself. <u>Id.</u> at 420. The supreme court of Kentucky disagreed with the argument, determining that in most cases, the judge's actions could have had a negative impact on a jury, but that, in the absence of a jury, there were no jury impact concerns. <u>Id.</u> Further, the court determined that the trial court did not "exceed its authorization to interrogate witnesses." <u>Id.</u> We agree. The trial judge presided over the post-conviction hearing, without a jury, and even though he questioned the witness at length without a jury there can be no argument that the trial judge's actions prejudiced the petitioner. Unquestionably trial judges as human beings may often find themselves forming opinions as to the credibility of witnesses. While expressing those sentiments before a jury may give rise to concern that the trial judge's statements or actions have prejudiced the

finder of fact, this concern is not present where the trial judge is the trier of fact. We conclude that it was not error for the post-conviction judge to fail to recuse himself for questioning Dr. Einstein.

The petitioner also argues that the post-conviction judge at trial predetermined post-conviction issues concerning the effectiveness of counsel, specifically by sending a letter to defense counsel to acknowledge his participation in such a "thankless task" and by noting on the form for first degree murder cases required to be completed by the trial court pursuant to Tennessee Supreme Court Rule 12, that trial counsel's representation had been "[v]ery capable." While the statements about trial counsel were clearly complimentary, the statements were made well before any claim of ineffective assistance of counsel had been presented. This Court will not infer from those comments alone that the trial court could not be impartial in a subsequent post-conviction claim. See Thomas E. Montooth v. State, No. 01C01-9604-CC-00126, 1997 WL 381907, at *2 (Tenn. Crim. App., at Nashville, Jul. 11, 1997), perm. app. denied (Tenn. 1998) (determining that trial judge who had been complimentary of trial counsel's performance did not abuse its discretion in failing to recuse himself from a post-conviction claim alleging ineffective assistance of counsel).

On the whole, we find the facts before this Court similar to those presented in Harris. While we do not sanction the conduct of the post-conviction judge, specifically his participation as a witness, we conclude that the judge's conduct did not diminish the overall fairness of the proceeding. Nevertheless, while not requiring a reversal in this case, a judge's continued role as presiding over a proceeding in which he or she is or is likely to become a witness is a course fraught with peril and should be avoided whenever possible. See Tenn. R. Evid. 605 (providing that a judge may not testify in a trial over which the judge is presiding).

### III. Challenges to the Post-Conviction Court's Findings

#### A. Standard of Review

The petitioner contends that a contradiction exists in the current status of the law governing review of ineffective assistance of counsel claims. In State v. Burns, 16 S.W.3d 453 (Tenn. 1999), our supreme court held that a claim of ineffective assistance of counsel is a mixed question of law and fact. See Burns, 6 S.W.3d at 461. In Fields v. State, 40 S.W.3d 450 (Tenn. 2001), our supreme court explained the standard of review in cases of ineffective assistance of counsel:

> [A post-conviction] court's findings of fact underlying a claim of ineffective assistance of counsel are reviewed on appeal under a de novo standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise. However, a [post-conviction] court's conclusions of law--such as whether counsel's performance was deficient or whether that deficiency was prejudicial--are reviewed under a purely de novo standard, with no presumption of

correctness given to the [post-conviction] court's conclusions.

Id. at 458 (citations omitted).

In clarifying the standard, our supreme court noted that the standard for reviewing the factual findings of a trial court has always been in accordance with the requirements of the Rules of Appellate Procedure. See Id. at 456.

Petitioner asserts that the standard utilized in Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997), which states the post-conviction court's findings are given the "weight of a jury verdict," cannot be reconciled with the Rule 13(d) standard "de novo upon the record of the trial court, accompanied by a presumption of correctness." The petitioner then contends that this Court must apply the more relaxed de novo standard of review espoused in Fields. First, we note that the Henley standard invoked the Rules of Appellate Procedure regarding standards to be applied upon review. Henley, 960 S.W.2d at 578-79. Additionally, both the Henley and the Fields standards of review presume the trial court's findings are correct unless the evidence preponderates otherwise. See Fields, 40 S.W.3d at 458; Henley, 960 S.W.2d at 578. Finally, this Court is perplexed by the petitioner's complaint because the standard he seeks imposed is the standard employed by the appellate courts of this state.

*B. Findings of Post-Conviction Court Not Supported by a Preponderance of the Evidence*

The petitioner next asserts that the post-conviction court's findings are not entitled to the presumption of correctness because its findings are not supported by a preponderance of the evidence. In support of his argument, the petitioner relies upon several statements in the trial court's order to support his allegation:

(1) Post-conviction court's recitation of the underlying facts of the murder, specifically the court's characterization of the actions of Dr. Cima as "quick thinking." Petitioner asserts that this characterization demonstrates the fact that the court's concern was on the death of Deputy Bishop and not on the claims for relief from an unconstitutional conviction and sentence;

(2) Post-conviction court's description of the sentencing hearing as "long." Petitioner asserts that the sentencing hearing was conducted in one day and consists of 214 pages of trial transcript.

(3) Post-conviction court summarily concluded that the post-conviction petition revolves around trial counsel's deficiencies in the mitigation stages of the proceeding. Petitioner asserts that the court ignored other issues raised. Petitioner further asserts that the post-conviction court applied an erroneous standard and

33

incorrectly stated that Petitioner's argument was that bipolar disorder would have been a mitigating factor.

(4) Post-conviction court erroneously concluded that Petitioner voluntarily waived his right to a jury trial on the issue of punishment.

(5) Post-conviction court erroneously concluded that "[c]ounsel filed all appropriate motions;" "[c]ounsel allowed the investigative and mitigation expert to conduct their investigation and report to counsel their findings;" counsel "acted in a competent manner in presenting the psychological proof to the Court."

(6) Post-conviction court disregarded testimony of Dr. Frank Einstein, the Petitioner's expert as to mitigation investigation.

(7) Post-conviction court mischaracterized Dr. Auble's testimony.

(8) Post-conviction court's treatment of Dr. Kenner's diagnosis and testimony is "frankly astonishing."

The statements relied upon by the petitioner to support his assertion that the evidence preponderates against the post-conviction court's findings do not constitute viable challenges to the veracity of the lower court's findings of fact. Specifically, Petitioner's first three (3) claims are attacks against the court's choice of words. The terminology employed by the lower court does not affect the accuracy of the court's factual findings. In this regard, this challenge to the presumption of the lower court's findings fails. Similarly, the petitioner's allegations that the post-conviction judge improperly characterized all ineffective claims as claims attacking counsel's failure to prepare for mitigation, that the court mischaracterized Dr. Auble's testimony, and that the court discredited Dr. Kenner's testimony fail to impact the propriety of the court's factual findings. The petitioner has merely challenged the trial court's characterization of the evidence; he has failed to assert that the actual evidence preponderates against the factual findings. Finally, we conclude that the remainder of the petitioner's challenges to the "presumption of correctness" are actually challenges to the post-conviction court's "conclusions of law" concerning trial counsel's effectiveness and/or the voluntariness of the petitioner's plea and the submission of the punishment issue to the trial court. This Court reviews these issues de novo with no presumption of correctness and will do so as such issues are raised infra.

## IV. Ineffective Assistance of Counsel

The Sixth Amendment provides, in pertinent part, that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. This right to counsel is "so fundamental and essential to a fair trial, and so, to due process of law, that it is made obligatory upon the States by the Fourteenth Amendment." Gideon v. Wainwright, 372 U.S. 335, 350 (1963) (quoting Betts v. Brady, 316 U.S. 455, 465 (1942)). Inherent in the right to counsel is the right to effective assistance of counsel. Cuyler v. Sullivan, 446 U.S. 335, 344 (1980); McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970); see also Strickland

v. Washington, 466 U.S. 668, 686 (1984).

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, the petitioner bears the burden of showing that (a) the services rendered by trial counsel were deficient and (b) that the deficient performance was prejudicial. See Powers v. State, 942 S.W.2d 551,558 (Tenn. Crim. App. 1996). In order to demonstrate deficient performance, the petitioner must show that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). In order to demonstrate prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. See Strickland, 466 U.S. at 694. "Because a petitioner must establish both prongs of the test to prevail on a claim of ineffective assistance of counsel, failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim." Henley, 960 S.W.2d at 580.

As noted above, this Court will afford the post-conviction court's factual findings a presumption of correctness, rendering them conclusive on appeal unless the record preponderates against the court's findings. See id. at 578. However, as stated above, our supreme court has "determined that issues of deficient performance by counsel and possible prejudice to the defense are mixed questions of law and fact . . . ; thus, [appellate] review of [these issues] is de novo" with no presumption of correctness. Burns, 6 S.W.3d at 461.

Furthermore, on claims of ineffective assistance of counsel, the petitioner is not entitled to the benefit of hindsight. See Adkins v. State, 911 S.W.2d 334, 347 (Tenn. 1994). This Court may not second-guess a reasonably-based trial strategy, and we cannot grant relief based on a sound, but unsuccessful, tactical decision made during the course of the proceedings. See id. However, such deference to the tactical decisions of counsel applies only if counsel makes those decisions after adequate preparation for the case. See Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Once a guilty plea has been entered, effectiveness of counsel is relevant only to the extent that it affects the voluntariness of the plea. In this respect, such claims of ineffective assistance necessarily implicate the principle that guilty pleas be voluntarily and intelligently made. See Hill v. Lockhart, 474 U.S. 52, 56 (1985) (citing North Carolina v. Alford, 400 U.S. 25, 31 (1970)). As stated above, in order to successfully challenge the effectiveness of counsel, the petitioner must demonstrate that counsel's representation fell below the range of competence demanded of attorneys in criminal cases. See Baxter, 523 S.W.2d at 936. Under Strickland, 466 U.S. at 687, the petitioner must establish deficient representation and prejudice resulting from the deficiency. However, in the context of a guilty plea, to satisfy the second prong of Strickland, the petitioner must show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill, 474 U.S. at 59; see also Walton v. State, 966 S.W.2d 54, 55 (Tenn. Crim. App. 1997). Moreover, when challenging a death sentence, the petitioner must

35

show that "there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death." Henley, 960 S.W.2d at 579-80 (Tenn. 1997) (citing Strickland, 466 U.S. at 695).

## A. Claims Before this Court

On appeal, the petitioner claims that trial counsel, Michael Mosier and Andrew Johnston, failed to function as effective counsel as guaranteed by both the Tennessee and United States Constitutions. In this regard, the petitioner asserts that Mr. Mosier and Mr. Johnston denied him effective assistance of counsel by breaching acceptable standards for capital representation in that:

(1) Mr. Johnston was not qualified to represent Petitioner in a capital proceeding;

(2) Trial counsel failed to provide timely and sufficient funding for a mitigation specialist and failed to monitor and direct the mitigation investigation;

(3) Trial counsel failed to develop a relationship with the Petitioner, failed to consult with the Petitioner and failed to involve Petitioner in the preparation of the defense;

(4) Trial counsel was ineffective in permitting Petitioner to enter a guilty plea and waive jury sentencing;

(5) Trial counsel failed to pursue a change of venue;

(6) Trial counsel failed to inform themselves of developments in capital litigation; and

(7) Trial counsel failed to develop and make use of mitigation evidence. Trial counsel failed to present evidence that Petitioner was a good father and for failing to present other good acts of the Petitioner.

We proceed to review each of the petitioner's arguments and analyze them in light of trial counsel's conduct and performance.

### 1. Mr. Johnston was not qualified to represent the petitioner in a capital proceeding.

The petitioner asserts that Andrew Johnston, second chair counsel, was not qualified to represent him in a capital proceeding. While the petitioner acknowledges that appointment in this case was made prior to the effective date of the standards for appointment of counsel contained in the current version of Rule 13, Rules of the Tennessee Supreme Court, he asserts that the necessary qualifications of counsel in capital cases was standard. See ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (February 1989). The petitioner asserts that Mr. Johnston "did not come close to meeting these standards." In support of this position, the petitioner

relies upon a letter from the trial court to lead counsel dated June 3, 1997, in which the court states, "I'm going to attempt to appoint a local lawyer this week, who can do most of your housekeeping, babysitting, and logistical work." The petitioner interprets this statement as inferring that the trial court was more interested in appointing someone to file documents and keep up with the docket, rather than appointing an attorney capable of assisting in the difficult and complex representation of an individual facing the death penalty.

The petitioner recognizes that the core question is whether Mr. Johnston's performance was deficient to the prejudice of the petitioner. He responds that the fact that he was only provided one qualified attorney to his capital defense amounted to per se deficient performance.

"[T]he Sixth Amendment does not grant a defendant, who does have the absolute and unqualified right to appointed counsel, the additional right to counsel of his own choosing." However, since Gregg v. Georgia, 428 U.S. 153 (1976), it has become apparent that special skills are necessary to assure adequate representation of defendants in death penalty cases. See ABA, Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases at 5.1. However, there is no presumption that counsel is ineffective because of lack of experience in trying a particular kind of case. See Russell v. State, 849 So. 2d 85, 122 (Miss. 2003).

At the time of appointment in the present case, there was no specific criteria required of an attorney prior to receiving appointment in a capital case. Indeed, prior to July 1, 1997, the rule merely provided, "[i]n a capital case two attorneys may be appointed for one defendant." Tenn. Sup. Ct. R. 13, § 1 (prior to amendment in 1997) (emphasis added); see also Brimmer v. State, 29 S.W.3d 497, 503 (Tenn. Crim. App. 1998). Thus, under the applicable rule, the petitioner was not entitled to second chair counsel as of right. Moreover, no qualifying criteria was specified as to lead counsel. While we recognize that ABA standards as to capital representation were in place at the time of the appointment and while it must be conceded that Mr. Johnston failed to satisfy all of the suggested criteria established by the ABA, these guidelines are not binding upon the trial courts of this state. The trial court appointed Mr. Johnston as second-chair counsel, noting that the court had been impressed with Mr. Johnston's "legal acumen." Accordingly, the petitioner's argument that Mr. Johnston's lack of experience results in per se deficient performance is not supported in law.

In addition to Mr. Johnston's failure to satisfy any criteria relating to the appointment of capital counsel, the petitioner cites to numerous other factors indicating that his lack of experience constituted deficient performance, for example: (1) counsel did not have any experience in working with experts; (2) counsel failed to timely secure sufficient funds for the mitigation specialist; and (3) lead counsel was not qualified to handle a capital case under Rule 13, Rules of the Tennessee Supreme Court. Again, we refuse to conclude that these allegations automatically result in a finding of deficient performance. A successful claim of ineffectiveness requires more than just a showing that trial counsel was inexperienced. Rather, the petitioner must demonstrate with specificity that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the

defendant by the Sixth Amendment." Strickland, 466 U.S. at 687. Even if a defendant meets this threshold, he or she must also prove that such error prejudiced the defense. Id. Furthermore, in the context of a guilty plea, the petitioner must show that there is a reasonable probability he would have not pleaded guilty if not for trial counsel's error. Hill, 474 U. S. at 59. We proceed therefore to examine the petitioner's specific allegations of deficient performance.

### 2. Counsel's performance as it related to obtaining funding for and monitoring the mitigation investigation.

Trial counsel's motions for court-appointed expert assistance were granted. The petitioner complains, however, that "[a]sking for services does not absolve defense counsel of the duty to properly utilize those services." The petitioner asserts that trial counsel failed to adequately and timely move for additional funds for the mitigation specialist. Specifically, he refers to the motion for continuance conducted on July 6, 1998, the day trial was scheduled to begin.

At the motion for continuance, Ms. Fenyes testified that she had only spent forty (40) hours working on the case, noting specifically that she had only been granted funds to complete twenty (20) hours of work. She stated that it was not her policy to continue to work absent funding. As of July 6, 1998, Ms. Fenyes estimated that she needed to complete an additional thirty (30) to forty (40) hours of work to adequately prepare for this case. She added that funding for these services had not been approved until the week prior to the July 6 trial date.

Mr. Johnston informed the trial court that trial counsel "made application for additional funds on May, the 7th, in this case and Your Honor immediately signed those orders . . . ." He explained that the request for funds was then forwarded to the Administrative Office of the Courts ("AOC") for the signature of the Chief Justice. Mr. Johnston later contacted the AOC to determine the status of the fund request, at which time, he was informed that the request had yet to be signed by the Chief Justice. From this point, Mr. Johnston spent the next "three weeks to four weeks . . . calling up to the Chief Justice's office to determine where the orders were." He explained that his contact at the AOC was on vacation and that she was the only one that could assist him with funding requests. Mr. Johnston's office continued to make contact with the AOC regarding the status of the fund request. The Monday prior to July 6, the AOC contacted Ms. Fenyes, informing her that the requests "are going to be signed; go ahead; get it done."

The trial record does nothing to bolster the petitioner's assertion that counsel failed to timely file motions requesting funds and failed to file motions requesting sufficient funds. Counsel cannot be found deficient for actions beyond their control. The request was made two (2) months prior to the scheduled commencement of the trial. It was unforeseeable that the request would not be granted until two (2) months after its submission. The petitioner is not entitled to relief as to this claim. We also find without merit petitioner's two-sentence argument that "[h]ad defense counsel understood the development of mitigation and directed their experts they would have been able to supply information critical to reaching a reliable diagnosis of a serious bi-polar illness." The substance of this argument, regarding the lack of mitigation evidence, will be addressed infra.

38

**3. Counsel failed to develop a relationship with the petitioner, failed to consult with the petitioner and failed to involve the petitioner in the preparation of a defense.**

The petitioner contends that trial counsel failed to consult and involve the petitioner in the defense of his own life. He states that the limited visits between himself and his counsel prohibited either attorney from developing any type of relationship with the petitioner. Thus, the petitioner argues that he was precluded from developing a trusting relationship with the very people entrusted with his life. He adds that counsels' failure to consult with the petitioner prohibited them from monitoring the petitioner's mental health and prohibited the petitioner from being involved in his defense. This lack of contact with the petitioner also impacted counsels' relationship with the petitioner's mother, Sally Johnson. The fact that counsel failed to develop a relationship with Mrs. Johnson denied counsel critical information regarding the family dynamics and the existence of the petitioner's mental illness.

The United States Supreme Court has stated that the right to counsel as guaranteed by the Sixth Amendment to the United States Constitution does not include "the right to a meaningful attorney-client relationship." See Morris v. Slappy, 461 U.S. 1, 13 (1983). Indeed, the Court stated that "no court could possibly guarantee that a defendant will develop this kind of rapport with his attorney." Id.

According to the petitioner, Mr. Mosier met with him on at least six (6) occasions and Mr. Johnston met with the petitioner on at least four (4) occasions. The record reveals a large amount of correspondence between the petitioner and counsel. A large portion of this correspondence involved the petitioner's questions regarding the possibility of entering a guilty plea and the consequences of having the jury impose the sentence compared to having the judge impose the sentence. Mr. Mosier acknowledged that, on one occasion, it was brought to his attention that the petitioner was dissatisfied with their representation. Within several days of receiving this information, Mr. Mosier visited the petitioner at Riverbend. The petitioner expressed no further dissatisfaction with counsel until after a sentence of death was imposed by the trial court. Trial counsel cited no other occasions where they had difficulty with the petitioner. Rather, both trial counsel found the petitioner respectful and pleasant. At his guilty plea proceeding, the petitioner informed the trial court that Mr. Mosier and Mr. Johnston had met with him and that he was satisfied with their representation. Finally, the petitioner failed to testify at the post-conviction evidentiary hearing. The petitioner has failed to demonstrate what he could have communicated to his attorney that would have aided in his defense had counsel established a greater level of communication. See Lloyd v. State, 669 N.E.2d 980 (Ind. 1996); cf. State v. Creech, 966 P.2d 1, 19-20 (Idaho 1998), cert. denied, 526 U.S. 1147 (1999) (determining that it was not ineffective assistance of counsel where counsel did not spend a lot of time with a client who was unwilling to listen to counsel's advice). Moreover, there is nothing demonstrating that the petitioner was prohibited from effective communication with trial counsel. See Washington v. Meachum, 680 A.2d 262, 282 (Conn. 1996)

(holding that the right to assistance of counsel includes the right to communicate effectively with counsel in preparation of one's defense). Accordingly, he has failed to satisfy his burden of establishing that he did not have a working relationship with counsel. Further, the petitioner has not shown that he was prejudiced by his relationship with counsel or that had counsel spent more time with him, he would not have pled guilty and insisted on going to trial.

The petitioner also faults counsel for failing to develop a relationship with the petitioner's mother. The record indicates, as does the trial transcript, that the petitioner's mother was interviewed by the defense team. Her testimony, as well as that of other witnesses, indicates that Sally Johnson was defensive regarding claims against the petitioner and maintained his innocence, faulting others for mistakes that he had made. Additionally, the petitioner has failed to assert that his mother would have been more forthcoming had counsel "actively wooed" her. The petitioner's own post-conviction expert, Dr. Frank Einstein, described Mrs. Johnson as "very, very guarded." The petitioner has also failed to produce any family member, extended or otherwise, who provided insight into his alleged mental illness. Accordingly, we conclude there is no evidence that counsel would have gained insight into the petitioner's alleged mental illness if they had more actively pursued a relationship with the petitioner's mother. Petitioner is not entitled to relief as to this claim.

**4. Trial counsel's advice to the petitioner to enter guilty plea and waive jury sentencing.**

The petitioner's trial was scheduled to commence on July 6, 1998. That morning, trial counsel moved for and was granted a continuance until August 17, 1998. Later that afternoon, the petitioner entered a guilty plea to first degree murder and waived jury sentencing in this matter. On appeal, the petitioner asserts that this action was permitted absent "serious evaluation by his counsel, thus, violating counsel's duty to investigate the case and intelligently advise [his] client." In support of his claim, the petitioner makes several assertions, including: (1) the petitioner received "absolutely nothing" in return for his pleading guilty; (2) trial counsel was misinformed in his belief that Judge Blackwood was "philosophically opposed to the death penalty;" (3) trial counsel acquiesced to the trial court's in camera proceeding with its mitigation expert, during which Ms. Fenyes informed the trial court that there was no significant mitigation evidence; and (4) trial counsel failed to attempt to obtain a change of venue.

As noted supra, under Strickland, 466 U.S. at 687, the petitioner must establish deficient representation and prejudice resulting from the deficiency. However, in the context of a guilty plea, to satisfy the second prong of Strickland, the petitioner must show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill, 474 U.S. at 59; see also Walton, 966 S.W.2d at 55. Under the first prong of the Strickland test, a defendant must show that his attorney "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687. Moreover, in evaluating an ineffectiveness claim, this Court must presume that the "challenged action 'might be considered sound trial strategy.'" Id. at 689 (quoting Michel, 350 U.S. at 101). The petitioner bears the burden of overcoming this presumption. Id.

40

An attorney's advice to his client to waive the client's right to a trial by jury is a classic example of a strategic trial judgment, "the type of act for which Strickland requires that judicial scrutiny be highly deferential." Hatch v. Oklahoma, 58 F.3d 1447, 1459 (10th Cir. 1995) (quoting Green v. Lynaugh, 868 F.2d 176, 178 (5th Cir.), cert. denied, 493 U.S. 831 (1989) (per curiam). It constitutes a conscious, tactical choice between two viable alternatives. Hatch, 58 F.3d at 1459 (citing Carter v. Holt, 817 F.2d 699, 701 (11th Cir. 1987)); United States v. Ortiz Oliveras, 717 F.2d 1, 3 (1st Cir. 1983) (holding that tactical decisions, whether wise or unwise, successful or unsuccessful, cannot ordinarily form the basis of a claim of ineffective assistance of counsel). Thus, for counsel's advice to rise to the level of constitutional ineffectiveness, the decision to waive a jury must have been "completely unreasonable, not merely wrong, so that it bears no relationship to a possible defense strategy." Hatch, 58 F.3d at 1459.

Regarding the decision to enter the guilty plea, it is beyond question that the evidence establishing the petitioner's guilt was overwhelming. Thus, Mr. Johnston recalled that they believed that the petitioner's guilty plea would be considered as a mitigating factor by the trial court. In relation to waiving jury sentencing, Mr. Johnston testified that "we thought it would be in Mr. Henderson's best interest to have the court do the sentencing." The opinion of the defense team was that Judge Blackwood was personally opposed to the death penalty, and this opinion was influential in guiding their advice to the petitioner. In hindsight, Mr. Johnston conceded that he "wish[ed] that a jury would have been empaneled and that they would have fought the case on the merits."

Mr. Mosier testified that the petitioner made inquiry as to the possibility of entering a guilty plea in December 1997. The petitioner penned at least three (3) or four (4) more letters discussing the advantages of entering a guilty plea. Mr. Mosier verified Mr. Johnston's opinion that Judge Blackwood was opposed to the death penalty. However, he testified that the decision of whether to waive a jury trial was left entirely to the petitioner. Trial counsel advised him of the advantages and disadvantages of waiving a jury in a capital sentencing trial. These factors included weighing the circumstances of this particular case, which included the senseless killing of a law enforcement officer. Mr. Mosier stated that the decision to waive jury sentencing and permit Judge Blackwood to impose the sentence was the best chance that the petitioner had to avoid the death penalty. Again is should be noted that the petitioner did not testify at the post-conviction evidentiary hearing, so there is no direct evidence in this record that but for counsel's alleged deficiencies he would not have pled guilty or submitted his case to the trial judge for sentencing.

Prior to entry of the plea, the trial court extensively questioned the petitioner regarding his decision to enter a guilty plea and to waive jury sentencing. This colloquy, which covers nearly twenty (20) full pages of transcript, reveals that the trial court made every attempt to discern that: (1) the petitioner was fully aware of and understood the nature of the charges and potential sentences against him; (2) the petitioner understood that he had the right to plead not guilty as to all of the charges and have a jury determine his guilt or innocence, explaining that a jury could find the petitioner guilty of some, all, or none of the charges; (3) the petitioner understood that he could be convicted of a lesser-included offense of the charged offense; (4) the petitioner understood that he had the right to have a jury determine his sentence if he was convicted of first degree murder; (5) the

41

petitioner understood the nature and dynamics of a capital sentencing hearing; (6) the petitioner understood the impact of waiving his right to have a jury impose sentence in his first degree murder conviction; (7) the petitioner understood that, as part of the plea, the State would dismiss three counts of the indictment charging the petitioner with felony murder; (8) the petitioner had discussed the decision to enter a guilty plea and waive jury sentencing with his attorneys, (9) the petitioner was satisfied with the representation provided him by appointed counsel and by the appointed experts; and (10) the petitioner was not suffering from any mental illness or disorder. On at least five (5) separate occasions, the trial court asked the petitioner whether his decision to waive his right to a jury trial as to guilt and to waive his right to a jury trial as to capital sentencing were entered freely and voluntarily. The record preponderates against any conclusion that the petitioner had no knowledge as to the impact of his decision to enter guilty pleas and waive jury sentencing.

A defendant asserting that his counsel was ineffective must show more than that counsel's advice was merely wrong. He must also show that it was completely unreasonable so that it bears no relationship to a possible defense strategy. See Hatch, 58 F.3d at 1459. Further, the petitioner must show that but for trial counsel's advice, he would not have pled guilty and would have insisted on going to trial. There is no dispute that the evidence establishing the petitioner's guilt as to the first degree murder of Deputy Bishop was overwhelming. Also, the petitioner has failed to establish that trial counsel's advice regarding entry of a guilty plea was unreasonable.

We are left to address counsel's advice regarding the decision to waive jury sentencing as to the punishment of first degree murder. In People v. Montgomery, 736 N.E.2d 1025 (Ill. 2000), the Illinois Supreme Court addressed whether counsel's advice to a capital defendant to waive jury sentencing was deficient performance. In Montgomery, defense counsel advised the defendant to enter a guilty plea and waive jury sentencing in light of alleged assurances from the trial court that a sentence of death would not be imposed. Montgomery, 736 N.E.2d at 1033-34. The defendant entered guilty pleas to two (2) murders and, following a bench trial for sentencing, the trial court imposed a death sentence. Id. at 1035. At the post-conviction evidentiary hearing, the trial judge and his court reporter denied making any assurances that a sentence less than death would be imposed upon defendant's entry of guilty pleas. Id. at 1035-36. The post-conviction court rejected counsel's allegations that the trial judge had made ex parte assurances regarding a sentence less than death. Id. at 1036. Regardless, the defendant stated that trial counsel had only informed him that this particular judge had never before sentenced a defendant to death in a bench proceeding, and that counsel therefore encouraged him to waive a jury for the sentencing hearing. Id. at 1037. This assertion by trial counsel was later proven untrue. Id. at 1039. Notwithstanding the mistaken beliefs and assertions of trial counsel, the Illinois supreme court found that trial counsel were not deficient in their advice to the defendant. Id.; see also People v. Maxwell, 670 N.E.2d 679 (Ill. 1996) (determining that trial counsel's advice to waive jury for capital sentencing was not deficient). The Illinois Supreme Court acknowledged that counsel's belief that a judge was less likely than a jury to impose the death penalty is a legitimate ground on which to base jury waiver in a capital sentencing trial. Montgomery, 736 N.E.2d at 1038.

42

Similarly, in Fields v. Gibson, 277 F.3d 1203 (10th Cir. 2002), the Tenth Circuit addressed whether counsel's advice to waive jury sentencing constituted deficient performance. Trial counsel believed that if the defendant accepted a blind plea that he would be sentenced to less than death. Fields, 277 F.3d at 1209. Her belief was based upon several conversations with the trial judge. Id. at 1209-10. Notwithstanding, there was no guarantee that the trial court would not impose a sentence of death. Id. at 1210. Counsel then persuaded defendant, with the assistance of several of his family members, to enter a guilty plea. Id. The trial court accepted the plea and after a bench sentencing hearing imposed a sentence of death. Id. Defendant later attempted to withdraw his plea, but his attempt was rejected by the trial court and the court's decision was upheld on appeal. Id. at 1211. The Tenth Circuit determined that the defendant's plea was voluntarily entered and that trial counsel's advice regarding the decision to waive jury sentencing did not constitute deficient performance. Id. at 1214-15. In finding counsel's advice not deficient, the court acknowledged that "[t]he fact that the desired result was not reached in this case does not render defense counsel ineffective." Id. at 1216 (citing Fields v. State, 923 P.2d 624, 635 (Okla. Crim. App. 1996)).

Lawyers are supposed to draw conclusions from all the evidence in a case and recommend what they think is in their clients' best interest. Fields, 277 F.3d at 1216. "The Supreme Court has recognized that because representation is an art and not a science, even the best criminal defense attorneys would not defend a particular client in the same way." Id. (quoting Waters v. Thomas, 46 F.3d 1506, 1522 (11th Cir. 1995) (en banc)). The record indicates that trial counsel made no guarantee to the petitioner that the trial court would not impose a death sentence. The evidence against the petitioner was overwhelming, as was the evidence of the statutory aggravating factors. Moreover, it is clear from the colloquy at the guilty plea hearing that the petitioner was informed that the trial court could impose a sentence of life, life without parole, or death. Thus, the petitioner made a conscious decision between two (2) viable options. Without more, the petitioner has failed to prove that counsel's advice was completely unreasonable. He is not entitled to relief on this issue.

### 5. Trial counsel failed to adequately pursue a motion for change of venue.

Prior to trial, trial counsel filed a motion requesting a change of venue. At argument on the motion, trial counsel argued that:

> [D]ue to the extensive pretrial publicity; due to the nature of the case; the very fact that it's a death penalty case; due to the nature of Deputy Bishop . . . being well-liked by everybody in this community. . . . We've attached copies of some newspaper articles in the Fayette County paper. . . . But the one headline that I think compels this Court to move this case from Fayette County is one attached, which is from the Wednesday, May 7, 1997 Edition, front page of the Fayette County Review, and the headlines show the photograph of Deputy Bishop. It shows a picture of a multitude of law enforcement vehicles, going . . . to the funeral home. . . . And the headline says this: "County Mourns Loss of Deputy Bishop." . . . I just don't feel like that Mr.

43

Henderson can get a fair trial in Fayette County.

Mr. Mosier further related other media reports detailing the petitioner's history of escape attempts. The trial court denied the motion, reserving final ruling on the matter until the conclusion of the voir dire process. The trial court noted that, if at the conclusion of voir dire of the venire that it appeared that it would be difficult to get a jury in this case, the trial court would then move the case.

Again, counsel sought a change of venue and the trial court reserved final determination until it was shown that it would be impossible to impanel an impartial jury. The petitioner entered an informed and counseled guilty plea prior to the trial court's ruling on the motion to change venue. The petitioner has waived any claim regarding change of venue by virtue of his voluntary guilty plea. See State v. McKinney, 74 S.W.3d 291, 306 (Tenn. 2002); State v. House, 44 S.W.3d 508, 513 (Tenn. 2001); See also Recor v. State, 489 S.W.2d 64, 69 (Tenn. Crim. App. 1972) (holding valid please of guilty waives issue of change of venue). The petitioner has failed to show that further efforts by counsel in seeking a change of venue would have created a situation where he would not have entered a guilty plea. Accordingly, the petitioner has failed to meet the standard for ineffective assistance of counsel in the guilty plea setting. Therefore, he is not entitled to relief as to this claim.

### 6. Trial counsel failed to inform themselves of developments in capital litigation.

The petitioner next asserts that trial counsel were deficient by their failure to stay abreast of developments in capital representation. The petitioner argues that trial counsel's failures impaired their ability to work with experts properly and ensure that the experts were performing the necessary tasks. In support of his position, the petitioner asserts that both Mr. Mosier and Mr. Johnston admitted their deficiency regarding working with experts. The petitioner asserts that this deficiency resulted in the loss of vital mitigation evidence. As stated earlier, issues addressing the failure to present mitigation evidence will be addressed as such. Our review as to this claim is merely as to whether Mr. Mosier's and Mr. Johnston's failure to inform themselves of developments in capital litigation constituted deficient performance.

The record reflects that Mr. Mosier had previous experience in capital litigation. Additionally, his testimony established that he was familiar with the use of experts and that the experts in this matter were hand-selected by him. The petitioner has failed to make specific allegations referencing the developments in the area of capital litigation of which trial counsel was unaware. Rather, the petitioner relies upon alleged deficiencies in the area of mitigation proof. We refuse to adopt a per se finding of deficiency based upon an allegation of counsel's lack of knowledge regarding recent developments in the law, especially in light of the absence of any reference by the petitioner of what legal developments counsel was allegedly unaware. The petitioner is not entitled to relief as to this claim.

44

### 7. Trial counsel failed to develop and introduce mitigation evidence.

The petitioner asserts that trial counsel failed to adequately utilize the services of a mitigation specialist to prepare a social history and timeline relating to the petitioner's life. In support of his allegations, the petitioner relies upon the testimony of his expert, Dr. Frank Einstein, who testified that Ms. Fenyes, the mitigation specialist, spent less than 38.5 hours working on mitigation from the time of her appointment until June 30, 1998. Dr. Einstein calculated that Ms. Fenyes spent an additional 28.9 hours on the case from June 30, 1998, until July 6, 1998, the date of the petitioner's guilty plea. Dr. Einstein testified that Ms. Fenyes worked an additional 43.5 hours between the date of the guilty plea on July 6 and the sentencing hearing held on July 13.

The petitioner contends that he has established his assertion through the testimony of lay witnesses and the introduction of medical records. He argues that evidence existed that would have raised serious issues about the existence of a mental disease or defect and would have provided significant mitigation. Specifically, the petitioner asserts that the need for further psychiatric evaluation would have been triggered had the defense team secured information relating to the history of mental illness in his extended family members and the petitioner's behavior during the two (2) years prior to the murder of Deputy Bishop. In this regard, the petitioner relies upon the diagnosis of Dr. Kenner that the petitioner suffers from bipolar disorder 2.

At the sentencing hearing, the defense team presented the testimony of four (4) witnesses. The petitioner testified that he was a twenty-four-year-old high school graduate and that he was the eldest of five (5) sons. Trial counsel introduced evidence of the petitioner's achievements in both elementary and high school, including fourteen (14) achievement awards from Central Elementary School during the period between 1985 and 1988 and two (2) awards related to the petitioner's

participation in the Fayette County Athletic League.[1]  The petitioner also testified to being very involved in extracurricular activities during high school, including the following: basketball team, 4-H Club president, student body president, track and baseball.  Miles Wilson, the principal of Fayette-Ware High School, further testified that the petitioner was an officer in the library club and a member of the Esquire club.  He participated both as an athlete and a coach in the Fayette County Athletic League.  The petitioner's talent as an artist was also explored, emphasizing that he had won a contest naming Sonic Restaurant's newspaper and drawing the cover for the paper and winning first place in an art contest with his drawing of the Fayette County Courthouse.  The petitioner also testified that he drew the logo and designed the window for Somerville Electronics.

When testifying, the petitioner expressed his remorse and apologies to Deputy Bishop's family and to the Fayette County Sheriff's Department.  He stated that, while incarcerated in Arkansas, he asked his mother to inquire as to obtaining him psychological help because "things that I was going through mentally wasn't normal."  He stated that his mother contacted the sheriff but that nothing was done.

The petitioner's high school principal, Miles Wilson, stated that the petitioner was respectful to faculty members and that he had positive interaction with the other students, with the exception of two incidents.  Mr. Wilson stated that the petitioner's mother was in denial that the petitioner could do anything wrong.

The petitioner's mother, Sally Johnson, testified that she was fifteen (15) years old when the petitioner was born.  She did not marry the petitioner's father.  She did not recall the petitioner having any problem with other students during high school, although she remembered one incident when the petitioner left the campus with his girlfriend.  She also vaguely recalled the petitioner

---

[1]These awards include the following:

| | |
|---|---|
| May 1988 | Outstanding Speaker |
| May 1988 | Honorable Mention Math |
| May 1988 | High Achievement Reading and Spelling |
| February 1988 | Fayette County Spelling Bee |
| May 1987 | Honor Roll History |
| May 1987 | Academic Achievement |
| May 1987 | Honorable Mention Math |
| May 1987 | Highest Academic Average |
| May 1987 | Outstanding Performance in Basketball |
| May 1986 | Honor Roll |
| May 1986 | Highest Academic Average in Spelling |
| May 1986 | Highest Academic Average |
| May 1986 | Honorable Mention Math |
| June 1985 | Great Helper |
| June 1985 | Honor |
| August 1990 | First Place Coach |
| August 1991 | Fayette County Athletic League Award |

46

requesting psychological treatment. She could not recall what happened. Mrs. Johnson blamed the petitioner's girlfriend, Natonya Cobb, for his behavior.

Dr. Lynn Zager, a clinical psychologist, testified regarding her meetings and evaluations of the petitioner. She diagnosed the petitioner with a dissociative state, narcissitic traits and antisocial traits.

Trial counsel testified at the post-conviction hearing that they presented all of the mitigating evidence that they had collected. The petitioner now alleges that trial counsel was ineffective for failing to present a complete mitigation profile. His complaints include counsel's: (1) failure to interview extended family members to reveal a family history of mental illness; (2) failure to seek additional psychological evaluation to reveal a diagnosis of bipolar disorder; and (3) failure to complete investigation to sufficiently indicate marked change in behavior, including (a) a change in sleep patterns, (b) the fact that his victims were people that he knew, (c) exhibitions of depression, and (d) indication of religious ideation.

In the context of capital cases, a defendant's background, character, and mental condition are unquestionably significant. "[E]vidence about the defendant's background and character is relevant because of the belief . . . that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." California v. Brown, 479 U.S. 538, 545 (1987); see Eddings v. Oklahoma, 455 U.S. 104, 113-15 (1982); Lockett v. Ohio, 438 U.S. 586, 604-05 (1978) (plurality opinion); Zagorski v. State, 983 S.W.2d 654, 657-58 (Tenn. 1998); Goad, 938 S.W.2d at 369. The right that capital defendants have to present a vast array of personal information in mitigation at the sentencing phase, however, is constitutionally distinct from the question whether counsel's choice of what information to present to the jury was professionally reasonable.

There is no constitutional imperative that counsel must offer mitigation evidence at the penalty phase of a capital trial. Nonetheless, the basic concerns of counsel during a capital sentencing proceeding are to neutralize the aggravating circumstances advanced by the State and to present mitigating evidence on behalf of the defendant. Although there is no requirement to present mitigating evidence, counsel does have the duty to investigate and prepare for both the guilt and the penalty phase. See Goad, 938 S.W.2d at 369-70.

To determine whether or not trial counsel was ineffective for failing to present mitigating evidence, the reviewing court must consider several factors. First, the reviewing court must analyze the nature and extent of the mitigating evidence that was available but not presented. Goad, 938 S.W.2d at 371 (citing Deutscher v. Whitley, 946 F.2d 1443 (9th Cir. 1991); Stephens v. Kemp, 846 F.2d 642 (11th Cir. 1988); State v. Adkins, 911 S.W.2d 334 (Tenn. Crim. App. 1994); Cooper v. State, 847 S.W.2d 521, 532 (Tenn. Crim. App. 1992)). Second, the court must determine whether

substantially similar mitigating evidence was presented to the jury in either the guilt or penalty phase of the proceedings. Id. (citing Atkins v. Singletary, 965 F.2d 952 (11th Cir. 1992), cert. denied, 515 U.S. 1165 (1995); Clozza v. Murray, 913 F.2d 1092 (4th Cir. 1990), cert. denied, 499 U.S. 913(1991); Melson, 722 S.W.2d at 421). Third, the court must consider whether there was such strong evidence of applicable aggravating factor(s) that the mitigating evidence would not have affected the jury's determination. Id. (citing Fitzgerald v. Thompson, 943 F.2d 463, 470 (4th Cir. 1991), cert. denied, 502 U.S. 1112 (1992)); Elledge v. Dugger, 823 F.2d 1439 (11th Cir. 1987), cert. denied, 485 U.S. 1014 (1988)).

It appears that the crux of the petitioner's complaint is the failure to introduce evidence regarding the alleged existence of a bipolar type 2 mental illness. The existence of such a mental illness would have been apparent, suggests the petitioner, had trial counsel discovered a family history of mental illness and evidence of the petitioner's erratic criminal behavior. Dr. Zager failed to diagnosis the petitioner with anything more severe than a personality disorder. The petitioner blames this diagnosis on trial counsel's failure to gather sufficient information. The petitioner ignores the fact that Dr. Zager's diagnosis remained the same even after reviewing the additional information. Moreover, the petitioner's own post-conviction witness, Dr. Auble, arrived at essentially the same diagnosis as Dr. Zager. While Dr. Kenner eventually diagnosed the petitioner as Bipolar Type 2, his diagnosis would have necessitated the introduction of evidence regarding the petitioner's escalating history of violent crime, which is a tactic with considerable risk. The petitioner's claim, at best, amounts to an assertion that counsel should have obtained an expert who would have diagnosed the petitioner as Bipolar Type 2. The Constitution does not require attorneys to "shop around" for more favorable expert testimony. Poyner v. Murray, 964 F.2d 1404, 1419 (4th Cir. 1992). Additionally, the necessary introduction of the petitioner's violent criminal behavior could have undermined this mitigating factor and outweighed any beneficial mitigating impact of the mental illness evidence. This "undiscovered" mitigation evidence raised by the petitioner was correctly characterized by the post-conviction court as being a "double-edged sword."

Given the strength of the proof of the aggravating circumstances relied upon by the State, the mitigation evidence that was presented at sentencing and the possible negative impact of the "undiscovered" mitigation evidence, we conclude that had this information been presented to the court there is little reason to believe the trial judge would impose a sentence other than death. The petitioner is not entitled to relief on this basis. Indeed, in this case, unlike the situation where a jury imposes a death sentence, we are not left to speculate to some degree as to the effect this evidence might have had on the sentencer. The sentencer in this case, the trial judge himself, found this evidence would not have altered the result of the sentencing hearing.

## V. Appellate Counsel was Ineffective

Michael Robbins was appointed to represent the petitioner on direct appeal of his sentence. The petitioner implies that Mr. Robbins was not qualified to pursue a direct appeal because this was

Mr. Robbins's first capital appeal. In support of his allegation, the petitioner refers to Mr. Robbins's failure to raise any issue other than proportionality. He states that Mr. Robbins failed to raise issues raised in pre-trial motions, specifically those challenging the constitutionality of the death penalty. He asserts that Mr. Robbins should have made the following challenges on direct appeal: (1) the indictment should be dismissed due to illegality and unconstitutionality of Tennessee Code Annotated sections 39-13-205 and 39-13-206; (2) the death penalty violates article I, section 19 of the Tennessee Constitution; (3) the State failed to declare publicly the standards which it applies in determining whether to seek the death penalty of any individual defendant; (4) the trial court erred in denying his motion for discovery of dispositions of all first degree murder prosecutions in the State of Tennessee; (5) the death penalty statute violates the Eighth and Fourteenth amendments of the United States Constitution; (6) the Tennessee death penalty statute impinges upon the petitioner's right to life; and (7) Tennessee's death penalty statute is unconstitutional in that it involves torture. The petitioner also complains that Mr. Robbins failed to competently argue the only issue raised on appeal, proportionality. Finally, the petitioner asserts that Mr. Robbins failed to follow through with "the business of the letter," relating to several attempts made by the petitioner to withdraw his guilty plea.

The same principles apply in determining the effectiveness of both trial and appellate counsel. Campbell v. State, 904 S.W.2d 594, 596 (Tenn. 1995). Criminal appellate work constitutes approximately forty percent (40%) of Mr. Robbins' legal practice. He attended national habeas seminars focusing on capital cases. At the post-conviction hearing, Mr. Robbins asserted that he considered the proportionality issue the only viable issue for appellate purposes.

A petitioner alleging ineffective assistance of appellate counsel must prove both that (1) appellate counsel acted objectively unreasonably in failing to raise a particular issue on appeal, and (2) absent counsel's deficient performance, there was a reasonable probability that defendant's appeal would have been successful before the state's highest court. See e.g., Smith v. Robbins, 528 U.S. 259, 285 (2000); Aparicio v. Artuz, 269 F.3d 78, 95 (2nd Cir. 2001); Mayo v. Henderson, 13 F.3d 528, 533-34 (2d Cir. 1994). To show that counsel was deficient for failing to raise an issue on direct appeal, the reviewing court must determine the merits of the issue. Carpenter v. State, 126 S.W.3d 879, 887 (Tenn. 2004) (citing Kimmelman v. Morrison, 477 U.S. 365, 375 (1986)). Obviously, if an issue has no merit or is weak, then appellate counsel's performance will not be deficient if counsel fails to raise it. Id. Likewise, unless the omitted issue has some merit, the petitioner suffers no prejudice from appellate counsel's failure to raise the issue on appeal. Id. When an omitted issue is without merit, the petitioner cannot prevail on an ineffective assistance of counsel claim. Carpenter, 126 S.W.3d at 888 (citing United States v. Dixon, 1 F.3d 1080, 1083 (10th Cir.1993)). Additionally, ineffectiveness is very rarely found in cases where a defendant asserts that appellate counsel failed to raise an issue on direct appeal, primarily because the decision of what issues to raise is one of the most important strategic decisions to be made by appellate counsel.

Gray v. Greer, 800 F.2d 644, 646 (7th Cir. 1986), established a test for determining whether counsel was deficient in Strickland terms for failing to raise particular claims on direct appeal, i.e, "significant issues which could have been raised should then be compared to those which were raised. Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective counsel be overcome." Id.

In Carpenter v. State, our supreme court refused to hold that the Gray v. Greer standard was the conclusive test of finding deficient performance. Carpenter, 126 S.W.3d at 888. Our supreme court noted that the relative strength of the omitted issue is only one among many factors to be considered. Indeed, the court noted the numerous factors relied upon the Sixth Circuit Court of Appeals in evaluating appellate counsel's failure to raise issues.[2] Id. The non-exhaustive list includes:

1) Were the omitted issues "significant and obvious"?
2) Was there arguably contrary authority on the omitted issues?
3) Were the omitted issues clearly stronger than those presented?
4) Were the omitted issues objected to at trial?
5) Were the trial court's rulings subject to deference on appeal?
6) Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?
7) What was appellate counsel's level of experience and expertise?
8) Did the petitioner and appellate counsel meet and go over possible issues?
9) Is there evidence that counsel reviewed all the facts?
10) Were the omitted issues dealt with in other assignments of error?
11) Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

Carpenter, 126 S.W.3d at 888 (citing Mapes v. Coyle, 171 F.3d 408, 427-28 (6th Cir. 1999)).

Again, the petitioner complains that appellate counsel failed to raise issues concerning the constitutionality of the death penalty, for example: (1) the death penalty is arbitrarily imposed; (2) the sentencer does not have unlimited discretion not to impose death; (3) the death penalty is not imposed fairly; (4) the death penalty statute impinges upon the petitioner's fundamental right to life; and (5) the death penalty statute is unconstitutional because it imposes torture. These are essentially the same arguments that we have already determined that the petitioner waived for failure to assert them on direct appeal. These issues have been repeatedly rejected by the appellate courts of this state on numerous occasions. See e.g., State v. Odom, 137 S.W.3d 572, 600 (Tenn. 2004) (determining

---

[2]Our supreme court did acknowledge, however, that the Sixth Circuit's final factor addresses the ultimate issue under the first prong of Strickland and is therefore not helpful in deciding whether appellate counsel's performance was deficient. Id. at 888-89.

that the death penalty is not unconstitutional under international law); State v. Holton, 126 S.W.3d 845 (Tenn. 2004) (holding that a sentence of death does not violate due process where the indictment fails to include language of the statutory aggravating circumstances that elevate the offense to capital murder); State v. Hines, 919 S.W.2d 573, 582 (Tenn. 1995), cert. denied, 519 U.S. 847 (1996) (concluding that unlimited discretion is vested in the prosecutor and that the death penalty was not imposed in a discriminatory manner). Further, the petitioner asserts no argument and cites no new authority requiring reversal of this precedent and does not show how he was prejudiced by counsel's failure to raise these issues. Mr. Robbins testified that he did not raise these issues on appeal because the law as to the claims was well-settled. Mr. Robbins was experienced in appellate matters and his decision to omit these issues and focus upon what he considered the single meritorious issue was reasonable.

An appellate attorney is neither duty bound nor required to raise every possible issue on appeal. Carpenter, 126 S.W.3d at 887 (citing King v. State, 989 S.W.2d 319, 334 (Tenn. 1999)); Campbell v. State, 903 S.W.2d 594, 596-97 (Tenn. 1995). Mr. Robbins, an experienced appellate advocate, focused on the only issue he felt had merit. See generally Cooper, 849 S.W.2d at 757 (determining that it is standard practice for advocates to weed out weak arguments in order to focus on one central issue). An attorney's determination as to the viability of the issues should be given considerable deference. Carpenter, 126 S.W.3d at 887; Campbell, 903 S.W.3d at 597. Application of the Carpenter factors indicate that counsel's decision was not deficient. Accordingly, no prejudice resulted. The petitioner is not entitled to relief as to his claim that appellate counsel was ineffective.

We proceed to address the petitioner's claim that appellate counsel was deficient for failing to "follow through with the business of the letter." In this allegation, the petitioner asserts that he filed various letters and pleadings with the trial court after the notice of appeal was filed. Appellate counsel, Mr. Robbins, believed that these pleadings amounted to an attempt to withdraw his guilty plea. Mr. Robbins filed a motion in this Court seeking remand to the trial court. This Court denied the motion and no review by the Tennessee Supreme Court was sought. Mr. Robbins stated that, upon further review, "the decision of the Court of Criminal Appeals was imminently sustainable because of the peculiar posture the record was in. And that is why I did not file a Rule 11."

No evidence regarding these subsequent pleadings was introduced at the post-conviction evidentiary hearing other than Mr. Robbins's testimony. This Court, however, is able to take judicial notice of its own records. Looking at this Court's records, it appears that the petitioner filed a pro se motion for remand on October 14, 1998. The substance of this motion reiterated the petitioner's dissatisfaction with counsel's advice and service. This motion was denied by this Court on November 3, 1998. On December 28, 1998, Mr. Robbins filed a motion to remand to the trial court for the purpose of developing a record regarding pleadings by the petitioner indicating that he wished to withdraw his guilty pleas. This Court denied the motion by order entered January 27, 1999. Given the procedural posture of the case at this point, we, as Mr. Robbins, conclude that further review would have been futile. Accordingly, we conclude that Mr. Robbins's decision not to seek further review of this Court's decision was reasonable. The petitioner is not entitled to relief as to

51

this claim.

## *VI. Post-Conviction Court Erred by Excluding Testimony of Kelly Gleason*

Kelly Gleason was called by post-conviction counsel as a witness. Ms. Gleason a former employee of the Capital Division of the Tennessee District Public Defender's Conference, was to testify as to the standards of practice expected of defense attorneys in capital cases. The post-conviction court refused to permit Ms. Gleason to testify. However, the court did grant the petitioner's request to submit a proffer of Ms. Gleason's testimony. That proffer was submitted in writing on May 7, 2003, in the form of a five-page memorandum of law regarding the need for the evidence, a thirty-three (33) page affidavit of Ms. Gleason, and one hundred-twenty-nine pages of attachments. By order of June 19, 2003, the trial court found that the proffer of evidence from Ms. Gleason would be of assistance and admitted it into evidence in the post-conviction proceedings.

We acknowledge that both parties have cited to cases from our sister jurisdictions, both federal and state, supporting their respective positions regarding the admissibility of a legal expert on capital case representation. Interestingly, both parties apparently overlook the legal standard for reviewing the admissibility of an expert's testimony.

"The admissibility of expert testimony, the qualification of expert witnesses, and the relevancy and competency of expert testimony are matters which rest within the sound discretion of the trial court." State v. Harris, 839 S.W.2d 54, 69 (Tenn. 1992). A witness who is qualified in a particular field may testify in the form of an opinion if the specialized knowledge of the witness will substantially assist the trier of fact in understanding evidence or determining a fact at issue. Tenn. R. Evid. 702. A trial court's ruling will not be overturned on appeal absent a clear abuse of discretion in admitting or excluding the expert testimony. State v. Stevens, 78 S.W.3d 817, 832 (Tenn. 2002). In the present case, the post-conviction judge stated that he had considerable experience in the area of capital cases and excluded the testimony of Ms. Gleason. The court, however, permitted a proffer by the petitioner. Subsequently, the post-conviction court entered an order, specifically finding that the proffer would be of assistance in the court's determination of the post-conviction claims. There is no indication that the post-conviction court was not qualified as a legal expert to render findings and conclusions of law without Ms. Gleason's testimony. Moreover, it appears that the post-conviction judge did consider the petitioner's comprehensive proffer regarding Ms. Gleason's proposed testimony. We conclude that the post-conviction court did not abuse its discretion in prohibiting Ms. Gleason's testimony. The petitioner is not entitled to relief as to this issue.

**Conclusion**

52

After a thorough review of the record and the law applicable to the issues raised herein, we find that the petitioner has failed to prove the allegations contained in his post-conviction petition. The judgment of the trial court is affirmed.

_____

JERRY L. SMITH, JUDGE